NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 08/05/201

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

NATIONAL CONVENTION SERVICES, LLC, and
EXSERVE, INC.

                                        Plaintiffs,

              -against-

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC.;
APPLIED UNDERWRITERS, INC.;
CALIFORNIA INSURANCE COMPANY;
ARS INSURANCE AGENCY;
APPLIED RISK SERVICES, INC.;
CONTINENTAL INDEMNITY COMPANY; and
J.A. FACCIBENE & ASSOCIATES, INC.

                                        Defendants.
------------------------------------------------------------------X

**SUMMONS**

Index No.: 652735/15E

Initial
Filing date: ~~July~~  , 2015
Aug. 5, 2015

Basis of Venue:
Plaintiff's Principal
Place of Business

**TO THE ABOVE-NAMED DEFENDANTS:**

     **YOU ARE HEREBY SUMMONED** to answer the Verified Complaint of the

plaintiffs, NATIONAL CONVENTION SERVICES, LLC, and EXSERVE, INC. , copies of

which are herewith served upon you, and to serve copies of your Answer(s) upon the

undersigned attorneys for the plaintiffs, O'CONNOR REDD LLP, whose address is PO

Box 1000, 242 King Street, Port Chester, NY 10573, within twenty (20) days after service

of the Summons and Verified Complaint, exclusive of the day of service, or within thirty

(30) days if such service is made upon you outside the State of New York, and in case

of your failure to appear or answer, judgment will be entered against you by default for

the relief demanded in the Verified Complaint.

Dated:        August 5, 2015
              Port Chester, NY

                                        Kevin Page
                                        O'CONNOR REDD LLP
                                        Attorneys for Plaintiffs
                                        NATIONAL CONVENTION SERVICES, LLC,
                                        and EXSERVE, INC

PO Box 1000
242 King Street
Port Chester, NY 10573
(914) 686-1700

To:   APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.
C/o LYNCH DALLAS, P.C.
526 Second Ave., SE (*Certified Mail*)
PO Box 2457
Cedar Rapids, Iowa 52406-2457
(319) 365-9101

APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.
C/o Jeffery A. Silver (*Registered Agent - Neb. Rev. Stat. § 25-509.01*)(*Cert. Mail*)
In-House Counsel
10805 Old Mill Road
Omaha, NE 68154
(402) 393-1984

APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.
C/o CT CORPORATION SYSTEMS (*Pursuant to NY CPLR § 313*)(*In-Hand*)
400 E. Court Ave.
Dew Moines, IA 50309

APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.
c/o NYS DEPT. OF FINANCIAL SERVICES (*Pursuant to NY Ins. Law § 1213*)
Office of General Counsel / Corporate Affairs Department
One State Street
New York City, NY 10004
(212) 480-6400

APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.
C/o NYS SECRETARY OF STATE (*CPLR § 311[a] & NYC BSC § 307[a]*)
One Commerce Plaza
99 Washington Avenue, 6th Floor
Albany, NY 12231
(518) 473-2492

APPLIED UNDERWRITERS, INC.
C/o NYS SECRETARY OF STATE (*CPLR § 311[a] & NYC BSC § 306[a]*)
One Commerce Plaza
99 Washington Avenue, 6th Floor
Albany, NY 12231
(518) 473-2492

APPLIED UNDERWRITERS, INC.
C/o Jeffery A. Silver (Registered Agent)(*Neb. Rev. Stat. § 25-509.01 - Cert. Mail*)

In-House Counsel
10805 Old Mill Road
Omaha, NE 68154
(402) 393-1984

CALIFORNIA INSURANCE COMPANY
C/o NYS DEPT. OF FINANCIAL SERVICES (*Pursuant to NY Ins. Law § 1212*)
Office of General Counsel / Corporate Affairs Department
One State Street
New York City, NY 10004
(212) 480-6400

CALIFORNIA INSURANCE COMPANY
C/o Michael Perkins (Registered Agent)(*Certified Mail and In-Hand*)
FINE, BOGGS & PERKINS, LLP
80 Stone Pine Road, Suite 210
Half Moon Bay, CA 94019
(650) 712-8908

ARS INSURANCE AGENCY
C/o NYS SECRETARY OF STATE (*CPLR § 311[a] & NYC BSC § 306[a]*)
One Commerce Plaza
99 Washington Avenue, 6th Floor
Albany, NY 12231
(518) 473-2492

ARS INSURANCE AGENCY
C/o Jeffery A. Silver (*Registered Agent - Neb. Rev. Stat. § 25-509.01*) (*Cert. Mail*)
In-House Counsel
10805 Old Mill Road
Omaha, NE 68154
(402) 393-1984

APPLIED RISK SERVICES, INC.
C/o NYS SECRETARY OF STATE (*CPLR § 311[a] & NYC BSC § 306[a]*)
One Commerce Plaza
99 Washington Avenue, 6th Floor
Albany, NY 12231
(518) 473-2492

APPLIED RISK SERVICES, INC.
C/o Jeffery A. Silver (*Registered Agent - Neb. Rev. Stat. § 25-509.01*)(*Cert. Mail*)
In-House Counsel
10805 Old Mill Road
Omaha, NE 68154
(402) 393-1984

CONTINENTAL INDEMNITY COMPANY
C/o NYS DEPT. OF FINANCIAL SERVICES (*Pursuant to NY Ins. Law § 1212*)
Office of General Counsel / Corporate Affairs Department
One State Street
New York City, NY 10004
(212) 480-6400

CONTINENTAL INDEMNITY COMPANY
C/o Jon M. McCright (Registered Agent)(*In-Hand and Cert. Mail*)
LYNCH DALLAS, P.C.
526 Second Ave., SE
Ceadar Rapids, IA 52406-2457
(319) 365-9101

J.A. FACCIBENE & ASSOCIATES, INC.
C/o NYS SECRETARY OF STATE (*CPLR § 311[a] & NYC BSC § 306[a]*)
One Commerce Plaza
99 Washington Avenue, 6th Floor
Albany, NY 12231
(518) 473-2492

J.A. FACCIBENE & ASSOCIATES, INC. (*Registered Agent - In-hand*)
C/o Joseph Faccibene
100 Merrick Road, Suite 526W
Rockville Centre, NY 11570
(516) 766-3513

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
NATIONAL CONVENTION SERVICES, LLC, and
EXSERVE, INC.

                                        Plaintiffs,

        -against-

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC.;
APPLIED UNDERWRITERS, INC.;
CALIFORNIA INSURANCE COMPANY;
ARS INSURANCE AGENCY;
APPLIED RISK SERVICES, INC.;
CONTINENTAL INDEMNITY COMPANY; and
J.A. FACCIBENE & ASSOCIATES, INC.

                                        Defendants.
-------------------------------------------------------------------------X

**VERIFIED
COMPLAINT**

Index No.: 652735/15 E

    Plaintiffs, NATIONAL CONVENTION SERVICES, LLC, and EXSERVE, INC.

(hereinafter "NSC" and "EXSERVE", respectively), as and for their Complaint against

Defendants, APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY,

INC. (hereinafter "AUCRAC"); APPLIED UNDERWRITERS, INC. (hereinafter "AU INC.");

CALIFORNIA INSURANCE COMPANY (hereinafter "CIC"); ARS INSURANCE AGENCY

(hereinafter "ARS AGENCY"); APPLIED RISK SERVICES, INC. (hereinafter "ARS INC.");

CONTINENTAL INDEMNITY COMPANY (hereinafter "CNI"); and J.A. FACCIBENE &

ASSOCIATES, INC. (hereinafter, "JA FACCIBENE"), by their attorneys, O'CONNOR

REDD LLP, respectfully allege, upon information and belief, as follows:

## THE PARTIES AND JURISDICTION

1.  At all times hereinafter mentioned, plaintiff NCS was and still is a domestic

corporation doing business in, and duly licensed by, the State of New York.

2.   At all times hereinafter mentioned, plaintiff EXSERVE was and still is a domestic corporation doing business in, and duly licensed by, the State of New York.

3.   Both plaintiffs NCS and EXSERVE are residence of New York State and have their principal place of business in New York City, NY.

4.   Plaintiffs are business contractors whom provide services to exposition/trade shows throughout the United States.

5.   At all times hereinafter mentioned, defendant AUCRAC was a licensed and authorized insurance broker and/or agent acting, operating, and soliciting business within the State of New York.

6.   At all times hereinafter mentioned, defendant AUCRAC was an unlicensed and unauthorized insurance broker and/or agent acting, operating, and soliciting business within the State of New York.

7.   At all times hereinafter mentioned, defendant AUCRAC was a licensed insurance company duly authorized to issue policies of insurance within the State of New York.

8.   At all times hereinafter mentioned, defendant AUCRAC was an unlicensed insurance company whose insurance policies provided coverage within the State of New York.

9.   At all times hereinafter mentioned, defendant AUCRAC was an unlicensed insurance company whose insurance policies and/or insurance coverage were solicited, written, issued, and delivered within the State of New York.

10.   At all times hereinafter mentioned, defendant AUCRAC was and still is a foreign corporation organized and existing under and by virtue of the laws of the State of

Iowa.

11.  At all times hereinafter mentioned, defendant AUCRAC was and still is a foreign corporation actually doing business within the State of New York.

12.  At all times hereinafter mentioned, defendant AUCRAC was and still is a foreign corporation authorized to do business within the State of New York.

13.  At all times hereinafter mentioned, defendant AUCRAC was and still is a foreign corporation transacting business within the State of New York and/or contracting to buy or sell goods and/or services within the State of New York, including but not limited to insurance policies and/or insurance services.

14.  At all times hereinafter mentioned, defendant AUCRAC contacted the plaintiffs to supply goods and/or services to the plaintiffs inside the State of New York, as well as elsewhere throughout the United States.

15.  At all times hereinafter mentioned, defendant AUCRAC committed tortious acts against the plaintiffs outside of the State of New York which they knew would result in damages, injuries and pecuniary losses to the plaintiffs inside the State of New York.

16.  At all times hereinafter mentioned, defendant AUCRAC transacted commercial business within the State of New York.

17.  At all times hereinafter mentioned, defendant AUCRAC regularly solicited business within the State of New York.

18.  At all times hereinafter mentioned, defendant AUCRAC engaged in a persistent course of conduct within the State of New York.

19.   At all times hereinafter mentioned, defendant AUCRAC derived substantial revenue from goods used or consumed and/or services rendered within the State of New York.

20.   At all times hereinafter mentioned, defendant AUCRAC expected or should have reasonably expected that their acts could have consequences within the State of New York and derived substantial revenue from interstate commerce involving the plaintiffs.

21.   At all times hereinafter mentioned, defendant AU INC. was a licensed insurance company duly authorized to issue policies of insurance within the State of New York.

22.   At all times hereinafter mentioned, defendant AU INC. was an unlicensed insurance company whose insurance policies provided coverage within the State of New York.

23.   At all times hereinafter mentioned, defendant AU INC. was an unlicensed insurance company whose insurance policies and/or insurance coverage were solicited, written, issued, and delivered within the State of New York.

24.   At all times hereinafter mentioned, defendant AU INC. was a licensed and authorized insurance broker and/or agent acting, operating, and soliciting business within the State of New York.

25.   At all times hereinafter mentioned, defendant AU INC. was an unlicensed and unauthorized insurance broker acting, operating, and soliciting business within the State of New York.

26.   At all times hereinafter mentioned, defendant AU INC. was and still is a foreign corporation organized and existing under and by virtue of the laws of the State of

Nebraska.

27.   At all times hereinafter mentioned, defendant  AU INC. was and still is a foreign
      corporation actually doing business within the State of New York.

28.   At all times hereinafter mentioned, defendant  AU INC. was and still is a foreign
      corporation authorized to do business within the State of New York.

29.   At all times hereinafter mentioned, defendant  AU INC. was and still is a foreign
      corporation transacting business within the State of New York and/or contracting
      to buy or sell goods and/or services within the State of New York, including but not
      limited to insurance policies and/or insurance services.

30.   At all times hereinafter mentioned, defendant AU INC. contacted the plaintiffs to
      supply goods and/or services to the plaintiffs inside the State of New York, as well
      as elsewhere throughout the United States.

31.   At all times hereinafter mentioned, defendant AU INC. committed a tortious act
      against the plaintiffs outside of the State of New York which they knew would
      result in damages, injuries, and pecuniary losses to the plaintiffs inside the State
      of New York.

32.   At all times hereinafter mentioned, defendant AU INC. transacted commercial
      business within the State of New York.

33.   At all times hereinafter mentioned, defendant AU INC. regularly solicited business
      within the State of New York.

34.   At all times hereinafter mentioned, defendant AU INC. engaged in a persistent
      course of conduct within the State of New York.

35.   At all times hereinafter mentioned, defendant AU INC. derived substantial revenue
      from goods used or consumed and/or services rendered within the State of New

York.

36.    At all times hereinafter mentioned, defendant AU INC. expected or should have reasonably expected that their acts could have consequences within the State of New York and derived substantial revenue from interstate commerce involving the plaintiffs.

37.    At all times hereinafter mentioned, defendant CIC was a licensed insurance company duly authorized to issue policies of insurance within the State of New York.

38.    At all times hereinafter mentioned, defendant CIC was an unlicensed insurance company whose insurance policies provided coverage within the State of New York.

39.    At all times hereinafter mentioned, defendant CIC was an unlicensed insurance company whose insurance policies and/or insurance coverage were solicited, written, issued, and delivered within the State of New York.

40.    At all times hereinafter mentioned, defendant CIC was and still is a foreign corporation organized and existing under and by virtue of the laws of the State of California.

41.    At all times hereinafter mentioned, defendant CIC was and still is a foreign corporation actually doing business within the State of New York.

42.    At all times hereinafter mentioned, defendant CIC was and still is a foreign corporation authorized to do business within the State of New York.

43.    At all times hereinafter mentioned, defendant CIC was and still is a foreign corporation transacting business within the State of New York and/or contracting to buy or sell goods and/or services within the State of New York, including but not

limited to insurance policies and/or insurance services.

44.  At all times hereinafter mentioned, defendant CIC  contacted the plaintiffs to supply goods and/or services to the plaintiffs inside the State of New York, as well as elsewhere throughout the United States.

45.  At all times hereinafter mentioned, defendant CIC committed tortious acts against the plaintiffs outside of the State of New York which they knew would result in damages, injuries, and pecuniary losses to the plaintiffs inside the State of New York.

46.  At all times hereinafter mentioned, defendant CIC transacted commercial business within the State of New York.

47.  At all times hereinafter mentioned, defendant CIC regularly solicited business within the State of New York.

48.  At all times hereinafter mentioned, defendant CIC engaged in a persistent course of conduct within the State of New York.

49.  At all times hereinafter mentioned, defendant CIC derived substantial revenue from goods used or consumed and/or services rendered within the State of New York.

50.  At all times hereinafter mentioned, defendant CIC expected or should have reasonably expected that their acts could have consequences within the State of New York and derived substantial revenue from interstate commerce involving the plaintiffs.

51.  At all times hereinafter mentioned, defendant ARS AGENCY was a licensed insurance company duly authorized to issue policies of insurance within the State of New York.

52.   At all times hereinafter mentioned, defendant ARS AGENCY was an unlicensed insurance company whose insurance policies provided coverage within the State of New York.

53.   At all times hereinafter mentioned, defendant ARS AGENCY was an unlicensed insurance company whose insurance policies and/or insurance coverage were solicited, written, issued, and delivered within the State of New York.

54.   At all times hereinafter mentioned, defendant ARS AGENCY was a licensed and authorized insurance broker and/or agent acting, operating, and soliciting business within the State of New York.

55.   At all times hereinafter mentioned, defendant ARS AGENCY was an unlicensed and unauthorized insurance broker and/or agent acting, operating, and soliciting business within the State of New York.

56.   At all times hereinafter mentioned, defendant ARS AGENCY was and still is a foreign corporation organized and existing under and by virtue of the laws of the State of Nebraska.

57.   At all times hereinafter mentioned, defendant ARS AGENCY was and still is a foreign corporation actually doing business within the State of New York.

58.   At all times hereinafter mentioned, defendant ARS AGENCY was and still is a foreign corporation authorized to do business within the State of New York.

59.   At all times hereinafter mentioned, defendant ARS AGENCY was and still is a foreign corporation transacting business within the State of New York and/or contracting to buy or sell goods and/or services within the State of New York, including but not limited to insurance policies and/or insurance services.

60.   At all times hereinafter mentioned, defendant ARS AGENCY contacted the plaintiffs to supply goods and/or services to the plaintiffs inside the State of New York, as well as elsewhere throughout the United States.

61.   At all times hereinafter mentioned, defendant ARS AGENCY committed tortious acts against the plaintiffs outside of the State of New York which they knew would result in damages, injuries, and pecuniary losses to the plaintiffs inside the State of New York.

62.   At all times hereinafter mentioned, defendant ARS AGENCY transacted commercial business within the State of New York.

63.   At all times hereinafter mentioned, defendant ARS AGENCY regularly solicited business within the State of New York.

64.   At all times hereinafter mentioned, defendant ARS AGENCY engaged in a persistent course of conduct within the State of New York.

65.   At all times hereinafter mentioned, defendant ARS AGENCY derived substantial revenue from goods used or consumed and/or services rendered within the State of New York.

66.   At all times hereinafter mentioned, defendant ARS AGENCY expected or should have reasonably expected that their acts could have consequences within the State of New York and derived substantial revenue from interstate commerce involving the plaintiffs.

67.   At all times hereinafter mentioned, defendant ARS INC. was a licensed and authorized insurance broker and/or agent acting, operating, and soliciting business within the State of New York.

68.  At all times hereinafter mentioned, defendant ARS INC. was an unlicensed and unauthorized insurance broker and/or agent acting, operating, and soliciting business within the State of New York.

69.  At all times hereinafter mentioned, defendant ARS INC. was a licensed insurance company duly authorized to issue policies of insurance within the State of New York.

70.  At all times hereinafter mentioned, defendant ARS INC. was an unlicensed insurance company whose insurance policies provided coverage within the State of New York.

71.  At all times hereinafter mentioned, defendant ARS INC. was an unlicensed insurance company whose insurance policies and/or insurance coverage were solicited, written, issued, and delivered within the State of New York.

72.  At all times hereinafter mentioned, defendant ARS INC. was and still is a foreign corporation organized and existing under and by virtue of the laws of the State of Nebraska.

73.  At all times hereinafter mentioned, defendant ARS INC. was and still is a foreign corporation actually doing business within the State of New York.

74.  At all times hereinafter mentioned, defendant ARS INC. was and still is a foreign corporation authorized to do business within the State of New York.

75.  At all times hereinafter mentioned, defendant ARS INC. was and still is a foreign corporation transacting business within the State of New York and/or contracting to buy or sell goods and/or services within the State of New York, including but not limited to insurance policies and/or insurance services.

76. At all times hereinafter mentioned, defendant ARS INC. contacted the plaintiffs to supply goods and/or services to the plaintiffs inside the State of New York, as well as elsewhere throughout the United States.

77. At all times hereinafter mentioned, defendant ARS INC. committed tortious acts against the plaintiffs outside of the State of New York which they knew would result in damages, injuries and pecuniary losses to the plaintiffs inside the State of New York.

78. At all times hereinafter mentioned, defendant ARS INC. transacted commercial business within the State of New York.

79. At all times hereinafter mentioned, defendant ARS INC. regularly solicited business within the State of New York.

80. At all times hereinafter mentioned, defendant ARS INC. engaged in a persistent course of conduct within the State of New York.

81. At all times hereinafter mentioned, defendant ARS INC. derived substantial revenue from goods used or consumed and/or services rendered within the State of New York.

82. At all times hereinafter mentioned, defendant ARS INC. expected or should have reasonably expected that their acts could have consequences within the State of New York and derived substantial revenue from interstate commerce involving the plaintiffs.

83. At all times hereinafter mentioned, defendant CNI was a licensed insurance company duly authorized to issue policies of insurance within the State of New York.

84.   At all times hereinafter mentioned, defendant CNI was an unlicensed insurance company whose insurance policies provided coverage within the State of New York.

85.   At all times hereinafter mentioned, defendant CNI was an unlicensed insurance company whose insurance policies and/or insurance coverage were solicited, written, issued, and delivered within the State of New York.

86.   At all times hereinafter mentioned, defendant CNI was and still is a foreign corporation organized and existing under and by virtue of the laws of the State of Iowa.

87.   At all times hereinafter mentioned, defendant  CNI was and still is a foreign corporation actually doing business within the State of New York.

88.   At all times hereinafter mentioned, defendant CNI was and still is a foreign corporation authorized to do business within the State of New York.

89.   At all times hereinafter mentioned, defendant CNI was and still is a foreign corporation transacting business within the State of New York and/or contracting to buy or sell goods and/or services within the State of New York.

90.   At all times hereinafter mentioned, defendant CNI contacted the plaintiffs to supply goods and/or services to the plaintiffs inside the State of New York, as well as elsewhere throughout the United States.

91.   At all times hereinafter mentioned, defendant CNI committed tortious acts against the plaintiffs outside of the State of New York which they knew would result in damages, injuries and pecuniary losses to the plaintiffs inside the State of New York.

92.  At all times hereinafter mentioned, defendant CNI transacted commercial business within the State of New York.

93.  At all times hereinafter mentioned, defendant CNI regularly solicited business within the State of New York.

94.  At all times hereinafter mentioned, defendant CNI engaged in a persistent course of conduct within the State of New York.

95.  At all times hereinafter mentioned, defendant CNI derived substantial revenue from goods used or consumed and/or services rendered within the State of New York.

96.  At all times hereinafter mentioned, defendant CNI expected or should have reasonably expected that their acts could have consequences within the State of New York and derived substantial revenue from interstate commerce involving the plaintiffs.

97.  At all times hereinafter mentioned, defendant JA FACCIBENE was a corporation duly formed under the laws of the State of New York.[1]

98.  At all times hereinafter mentioned, defendant JA FACCIBENE was a corporation authorized to transact business within the State of New York.

99.  At all times hereinafter mentioned, defendant JA FACCIBENE was an insurance broker and/or agent who sold goods and services to the plaintiffs, including policies of insurance and insurance services sold by the defendants AUCRAC, AU INC., CIC, ARS AGENCY, ARS INC., and CNI.

---

[1]

*Please note* that plaintiffs herein assert only one cause of action against defendant J.A. FACCIBENE & ASSOCIATES, INC., and that being the Eighteenth Cause of Action, Breach of Fiduciary Duty. All other causes of action outside of the Breach of Fiduciary Duty are hereby waived and withdrawn as against J.A. FACCIBENE & ASSOCIATES, INC. only.

## THE FACTS AND HISTORY OF INSURANCE COVERAGE
## AND PREMIUMS CHARGED

100.  The plaintiffs are companies who transacted business within the State of New York
      and throughout the United States, and are therefore required, pursuant to
      applicable laws, to carry Workers' Compensation insurance coverage for any on-
      the-job injuries involving their employees.

101.  In order to satisfy those obligations, the plaintiffs maintained Workers'
      Compensation insurance policies with various insurance carriers.

102.  On or around October of 2012, the plaintiffs began requesting quotes from
      Workers' Compensation carriers for new insurance policies to provide Workers'
      Compensation coverage for their employees and companies.

103.  The defendants solicited and proposed to the plaintiffs that they could provide
      Workers' Compensation coverage to the plaintiffs and their employees via the
      insurance polices the defendants issued.

104.  The defendants knew that they were soliciting business from the plaintiff inside the
      State of New York.

105.  The defendants were also aware that the Workers' Compensation policies being
      offered to the plaintiffs would have to conform to the requirements of New York
      State Insurance Laws and applicable Insurance Regulations (*see* 11 NYCRR §§
      1 - 440, and NY Ins. Law § 3103).

106.  The defendants forwarded to the plaintiffs proposals for Workers' Compensation
      coverage and policies, as well as quotes for such premiums, while the plaintiffs
      were in the State of New York.

107.   The defendants proposed to the plaintiffs a Workers' Compensation plan which was conveyed as a "profit sharing plan" (*see* **EXHIBIT "A"** for the "Reinsurance Participation Agreement", dated October 10, 2012; hereinafter "RPA").

108.   However, within the RPA agreement, the defendants agreed that the RPA would indeed provide Workers' Compensation insurance coverage to the plaintiffs - "During the active term of this agreement, Workers' Compensation insurance will be provided to Participant (plaintiffs) by one or more of the Issuing Insurers." (*see* **EXHIBIT "A"**, pg. 2, ¶ 2).

109.   Therefore, under the explicit terms of the RPA agreement the defendants would indeed be providing the plaintiffs with Workers' Compensation insurance coverage to the plaintiffs' companies and their employees.

110.   This "profit sharing plan" was improperly characterized as a reinsurance transaction, in order to skirt and avoid legal prohibitions and consumer protections under New York Insurance Laws and New York State Insurance Regulations.

111.   The proposed "profit sharing plan" consisted of two components: **(1)** a guaranteed cost Workers' Compensation insurance policy, for which AUCRAC and/or AU INC would procure for the plaintiffs through CNI and CIC, and/or their affiliated insurance companies,, and **(2)** a "protected cell" AUCRAC and/or AU INC would maintain for the plaintiffs' benefit, which would be the source of repayment to plaintiffs under the "profit sharing" concept conveyed to the plaintiffs.

112.   The defendants' proposal contemplated that Workers' Compensation insurance premiums that the plaintiffs paid would be deposited into the protect cell and that losses (i.e. - Workers' Compensation benefits paid) and expenses would be paid from the protected cell; that this proposal would 'save' the plaintiffs money and

was a 'good business deal' because it offered the opportunity for 'costs savings' on Workers' Compensation premiums being charged to the plaintiffs.

113. These monies would then be deposited with and retained by CIC.

114. At all times mentioned herein, CIC was fully aware that they would be holding monies from out-of-state companies, such as the plaintiffs herein.

115. The plaintiffs were also assured, and reasonably relied upon, all the representations made by the defendants concerning the "profit sharing program", which would save the plaintiffs money on their Workers' Compensation premiums, and that they would be having monies returned to them at either: **a)** the end of the plan, or **b)** when their last open Workers' Compensation claim was closed.

116. Instead of premiums calculated and charged yearly by the defendants for their Workers' Compensation coverage, the premiums charged to the plaintiffs were calculated and charged monthly, based upon factors unknown to the plaintiffs, and using calculations improperly manipulated and inflated by the defendants.

117. Additionally, the defendants did not inform the plaintiffs of the excessive fees, surcharges, expenses and exorbitant premiums that the defendants would inevitably be charging to the plaintiffs (i.e. - the hidden costs of the RPA program).

118. The defendants did not inform the plaintiffs that the calculation used to *estimate* the premiums *prior* to the entering into the agreement (i.e. - the initial estimated premium quote), would be significantly different that then calculations *actually used* to create the monthly premiums charged by the defendants.

119. Further, rate calculations used by the defendants are contrary to New York State Insurance Laws and Insurance Regulations, which require that all Workers' Compensation policies used rates established and promulgated by the New York

Compensation Insurance Rating Board, and approved by the Superintendent of the New York State Department of Financial Services (formerly the New York State Department of Insurance). *See* NY Ins. Laws §§ 2304(e) and (f), 2305(b), 2313(t)(5), 2314, 2319, 2324, 2339(b), 2347, 2404(e) and (f), and 11 NYCRR §§ 151-1.0 and 151-1.2.

120.   In reliance upon the actual representations made by the defendants and its agents, plaintiffs entered into the agreement entitled "*Reinsurance Participation Agreement*", for a period of October 10, 2012 to October 10, 2015 (i.e. - a three-year term)(*see* **EXHIBIT "A"**).

121.   Although the agreement is characterized as a "reinsurance participation agreement", it is in effect closer to a "*retrospective* rating insurance policy."[2]

122.   Regardless of what it was called or how it operated, pursuant to the terms of the RPA agreement the defendants promised to provide to the plaintiffs Workers' Compensation insurance coverage.  Ergo it is, in and of itself, an insurance policy, and therefore is subject to the New York State Insurance Laws and New York State Insurance Regulations.[3]

123.   The defendants purposely characterized and labeled this agreement as a "reinsurance agreement" in order skirt and avoid many legal requirements under

---

[2]

**Retrospective rating insurance plan** is an insurance policy plan which adjusts the premium, subject to a certain minimum and maximum amount, to reflect the current loss experience of the insured (rather than an industry wide loss-experience). Retrospective rating combines actual losses with graded expenses to produce a premium that more accurately reflects the current experience of the insured. Adjustments are performed periodically, **after** the policy has expired (i.e. - not during the policy term).

[3]

*Please note* that there are less insurance regulations and consumer protections involving reinsurance transactions, given that such transactions occur strictly between two insurance carriers, hence there is less need to provide any consumer protections under the law.  That is why the defendants mislabeled such transaction as a 'reinsurance agreement'

the Nebraska State Laws, as well as New York State Insurance Laws, relating to

insurance policies solicited, written, issued, and delivered within the State of New

York.

124.    The RPA is written and structured to purposely mislead the plaintiffs, and to avoid

and circumvent New York Insurance Laws and Nebraska Statutory Laws.

125.    In a true reinsurance transaction, an insured (a business/individual) contracts with

an initial insurance carrier for coverage against certain risks, and pays premiums

to that insurer, which issues a policy to the insured.  The initial insurance carrier

(the 'ceding carrier') then contracts with the reinsurance carrier (a separate and

distinct insurance company), whom insurers all or a portion of the insurer's risk

under the policy in exchange for a premium the ceding insurance carrier pays to

the reinsurer carrier.  The contracts and relationships in play between the initial

insured with the initial/ceding insurance carrier, and initial/ceding insurance carrier

with the reinsurance carrier remain distinct, separate, and unconnected.[4]

126.    However, despite being characterized as a reinsurance participation agreement,

the subject agreement is not part of a reinsurance transaction, because the

plaintiffs (the insureds) pay premiums directly to AUCRAC and/or AU INC (the

purported reinsurer), which in turn makes payment to CIC and/or CNI (the primary

---

[4]

*Couch on Insurance* (3d Ed.)(an authority on insurance coverage and insurance disputes) defines
'**reinsurance**' as: "**Reinsurance** is a contract whereby one insurer for a consideration agrees to
indemnify another insurer, either in whole or in part, against loss or liability, the risk of which the
latter has assumed under a separate and distinct contract as insurer of a third party." (§ 1:33) *See*
London Assurance Corp. v. Thompson, 170 N.Y. 94 (NY, 1902)(defining the reinsurance
transaction). *See also*, *Couch on Insurance* (3d Ed.), § 1:33, FN6, *citing* Iowa Mut. Tornado Ins.
Asso. v. Timmons, 252 Iowa 163, 105 N.W.2d 209 (Iowa, 1960), for the proposition that **"A true
reinsurer is merely an insurance company or underwriter which deals only with other
insurance companies as its policyholder. . . So considered, of course, there would be no
privity of contract existing between the insured and the reinsurance company**." Id., at pg.
174.

insurer). "When the reinsurer assumes direct liability to the original insured, there is a substitution of risks rather than reinsurance." <u>Iowa Mut. Tornado Ins. Asso. v. Timmons</u>, 252 Iowa 163, 175, 105 N.W.2d 209, 215 (1960), *citing* 13 Appleman Insurance Law and Practice, pages 433-505.

127.   Reinsurance refers to an "undertaking whereby one insurer agrees to protect another insurer, known as the reinsured, either wholly or partially from a risk which it has undertaken, both policies being in effect at the same time, and the original insured having no interest in the reinsurance." 13A Appleman, Insurance Law & Practice 7681, at 484-85 (1976). "When an insurer has the subject of insurance reinsured to him by another, there is **'no privity between the original insured and the reinsurer;** the latter is in no respect liable to the former as a surety or otherwise; **the contract of insurance and of reinsurance being totally distinct and disconnected.**' " <u>Reid v. Ruffin</u>, 314 Pa. Super. 46, 50, 460 A.2d 757, 759 (Sup. Ct., Pa., 1983), *aff'd*, 503 Pa. 458, 469 A.2d 1030 (1983), *quoting* <u>Appeal of Goodrich</u>, 109 Pa. 523, 529, 2 A. 209, 211 (PA., 1885).

128.   Assuming that the RPA is a reinsurance agreement and/or reinsurance policy, such reinsurance policies are <u>prohibited</u> in New York for Workers' Compensation coverage. *See* NY Ins. Law § 2318.

129.   Upon the plaintiffs entering into the RPA program (i.e - the first year of the RPA), the defendants issued/sold a Workers' Compensation insurance policy for the plaintiffs with CNI, for a policy period of October 10, 2012 to October 10, 2013 (*see* **EXHIBIT "B"** for the declarations pages to the subject policy).

130.   This Workers' Compensation policy with CNI provided coverage for the plaintiffs and their employees for the states of Alabama, Colorado, the District of Columbia,

Florida, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Wisconsin, and West Virginia (twenty [20] states, plus the District of Columbia)*(see* **EXHIBIT "B"**, pg. 1).

131. Additionally, in the first year of the RPA program, the plaintiffs were issued/sold another Workers' Compensation policy with CIC for the policy period of October 10, 2012 to October 10, 2013 (*see* **EXHIBIT "C"** for the declaration page of the subject policy).

132. This Workers' Compensation policy with CIC provided coverage for the plaintiffs and their employees for the states of Arizona, Connecticut, Georgia, Nevada, Oregon, Texas, and Utah (seven [7] states)(*see* **EXHIBIT "C"**, pg. 1).

133. At all times herein mentioned, the insurance polices referenced above **(EXHIBITS "B" and "C")** were solicited, issued, written and delivered to the plaintiffs in New York State, despite the Workers' Compensation policies providing coverage to other States and jurisdictions.

134. *Please note* that the named "insureds" listed on the CNI and CIC Workers' Compensation policies in **EXHIBITS "B"** and **"C"** are noted as being "EXSERVE INC", with "NCS" listed as an Additional Insured, pursuant to an endorsement on the policy (*see* pg. 2 of **EXHIBITS "B"** and **"C"**).

135. Had these Workers' Compensation policies at **EXHIBITS "B"** and **"C"** been issued to the supposed 'reinsurance carrier' (AUCRAC and/or AU INC), the insured would be listed as AUCRAC and/or AU INC. However, plaintiffs are listed as the insured on the declaration page of these policies (*see* pg. 1 of **EXHIBIT "B"** and **"C"**).   Therefore, the RPA agreement is not a 'reinsurance policy' and/or

'reinsurance agreement'.

136.   Further, had AURCAC and/or AU INC been a true 'reinsurance carrier', the plaintiffs would not have been paying them any premiums directly.

137.   Please note that the "total estimated annual premium" of the CNI policy is $136,867 (see **EXHIBIT "B"**, pg. 1), and the "total estimated annual premium" of the CNI policy is $97,298 (see **EXHIBIT "C"**, pg. 1) - which together is a combined "estimated annual premium" of $234,165 (with an 'estimated' monthly premium of $19,514 for both policies).

138.   However, in the first year of the RPA program, the plaintiffs paid a total of $749,892 in premiums to the defendants (with an average monthly premium of $62,491). This amount actually paid in premiums by the plaintiffs is three times the 'estimated' amounts provided by the defendants.

139.   In the first year of the RPA, the difference between the defendants' 'estimated annual premium' and the actual premiums charged in the first year of the RPA amounted to $515,727, representing the amount plaintiffs were overcharged by the defendants.

140.   In the second year of the RPA program, the defendants issued/sold a Workers' Compensation insurance policy to the plaintiffs with CNI, for a policy period of October 10, 2013 to October 10, 2014 (see **EXHIBIT "D"** for the declarations pages to the subject policy).

141.   This Workers' Compensation policy with CNI provided coverage for the plaintiffs and their employees for the states of Alabama, Colorado, the District of Columbia, Florida, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota,

Missouri, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Wisconsin, and West Virginia (twenty [21] states, plus the District of Columbia)(*see* **EXHIBIT "D"**, pg. 1).

142. Additionally, the plaintiffs were issued/sold another Workers' Compensation policy with CIC for the policy period of October 10, 2013 to October 10, 2014 (*see* **EXHIBIT "E"** for the declaration page to the subject policy).

143. This Workers' Compensation policy with CIC provided coverage for the plaintiffs and their employees for the states of Arizona, Connecticut, Georgia, Nevada, Oregon, Texas, and Utah (seven [7] states)(*see* **EXHIBIT "E"**, pg. 1).

144. At all times herein mentioned, the insurance polices referenced above (**EXHIBITS "D" and "E"**) were solicited, written, issued, and delivered to the plaintiffs in New York State, despite the Workers' Compensation policies providing coverage to other States and jurisdictions.

145. *Please note* that the named "insureds" listed on the CNI and CIC Workers' Compensation policies in **EXHIBITS "D"** and **"E"** are noted as being "EXSERVE INC", with "NCS" listed as an Additional Insured, pursuant to an endorsement on the policy (*see* pg. 2 of **EXHIBITS "D"** and **"E"**).

146. Had these Workers' Compensation policies at **EXHIBITS "D"** and **"E"** been issued to the supposed 'reinsurance carrier' (AUCRAC and/or AU INC), the insured would be listed as AUCRAC and/or AU INC. However, plaintiffs are listed as the insured on the declaration pages of these insurance policies (*see* pg. 1 of **EXHIBIT "D"** and **"E"**). Therefore, the RPA agreement is not a 'reinsurance policy' and/or 'reinsurance agreement'.

147. Further, had AURCAC and/or AU INC been a true 'reinsurance carrier', the plaintiffs would not have been paying any them premiums directly.

148. Please note that the "total estimated annual premium" in the second-year of the RPA for the CNI policy is $312,869 (*see* EXHIBIT "D", pg. 1), and the "total estimated annual premium" in the second-year of the RPA for the CIC policy is $136,867 (*see* EXHIBIT "E", pg. 1) - which together is a combined "estimated annual premium" of $449,736 (with an average 'estimated' monthly premium in the amount of $37,478 for both policies).

149. However, in the second year of the RPA program, the plaintiff paid a total of $846,237 in premiums to the defendants (with an average monthly premium of $70,520). This amount actually paid in premiums by the plaintiffs is almost double the estimated amounts provided by the defendants.

150. However, beginning in the last month of the second-year of the RPA (September of 2014), the monthly premium jumped to $142,614, without any justification or basis in fact or logic.

151. In the second-year of the RPA, the difference between the defendants' 'estimated annual premium' and the actual premiums charged to the plaintiffs amounted to $396,501, which represents the amount that plaintiffs were overcharged by the defendants.

152. In the third year of the RPA program, the defendants sold/issued a Workers' Compensation insurance policy to the plaintiffs with CNI, for a policy period of October 10, 2014 to October 10, 2015 (*see* EXHIBIT "F" for the declarations pages to the subject policy).

153. This Workers' Compensation policy with CNI provided coverage for the plaintiffs and their employees for the states of Alabama, Colorado, the District of Columbia, Florida, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Wisconsin, and West Virginia (twenty [21] states, plus the District of Columbia)(*see* **EXHIBIT "F"**, pg. 1).

154. Additionally, the plaintiffs were issued/sold another Workers' Compensation policy with CIC for the policy period of October 10, 2014 to October 10, 2015 (*see* **EXHIBIT "G"**).

155. This Workers' Compensation policy with CIC provided coverage for the plaintiffs and their employees for the states of Arizona, Connecticut, Georgia, Nevada, Oregon, Texas, and Utah (seven [7] states)(*see* **EXHIBIT "G"**, pg. 1).

156. At all times herein mentioned, the insurance polices referenced above (**EXHIBITS "F"** and **"G"**) were solicited, written, issued, and delivered to the plaintiffs in New York State, despite the Workers' Compensation policies providing coverage to other States and jurisdictions.

157. *Please note* that the named "insureds" listed on the CNI and CIC Workers' Compensation policies in **EXHIBITS "F"** and **"G"** are noted as being "EXSERVE INC", with "NCS" listed as an Additional Insured, pursuant to an endorsement on the policy (*see* pg. 2 of **EXHIBITS "F"** and **"G"**).

158. Had these Workers' Compensation policies at **EXHIBITS "F"** and **"G"** been issued to the supposed 'reinsurer carrier' (AUCRAC and/or AU INC), the insured would be listed as AUCRAC and/or AU INC. However, plaintiffs are listed as the insured on these insurance policies (*see* pg. 1 of **EXHIBITS "F"** and **"G"**).

Therefore, the RPA agreement is not a 'reinsurance policy' and/or 'reinsurance agreement'.

159. Further, had AURCAC and/or AU INC been a true 'reinsurance carrier', the plaintiffs would not have been paying any them premiums directly.

160. Please note that the "total estimated annual premium" for the third-year of the RPA for the CNI policy is $269,233 (*see* **EXHIBIT "F"**, pg. 1), and the "total estimated annual premium" for the third-year of the RPA for the CIC policy is $151,002 (*see* **EXHIBIT "G"**, pg. 1) - which together is a combined "estimated annual premium" of $420,235 (with an 'estimated' monthly premium of $35,020).

161. However, beginning in the last month of the second-year of the RPA program, and continuing into the first few months of the third-year of the RPA program, the premiums the defendants were charging to the plaintiffs began to exponentially increase, without any basis in fact or logic.

162. The premium charged by the defendants to plaintiffs in October of 2014 (the first-month of the third-year of the program) was $153,144, which was extremely inflated in comparison to the 'estimated' monthly premium of $35,020 for the third-year of the RPA program.

163. The premium charged by the defendants to plaintiffs in November of 2014 (the second-month of the third-year of the program) was $124,236, which was extremely inflated in comparison to the 'estimated' monthly premium of $35,020 for the third-year of the RPA program.

164. The premium charged by the defendants to plaintiffs in December of 2014 (the third-month of the third-year of the program) was $235,065, which was extremely inflated in comparison to the 'estimated' monthly premium of $35,020 for the third-year of the RPA program.

165. The premium charged by the defendants to plaintiffs in January of 2015 (the fourth-month of the third-year of the program) was $683,268, which was extremely inflated in comparison to the 'estimated' monthly premium of $35,020 for the third-year of the RPA program.

166. Given that the plaintiffs had manipulated and artificially inflated their premium calculations under the RPA program, the plaintiffs were overcharged $683,268 for the month of January 2015, which was almost twenty (20) times the estimated monthly premium of $35,020.

167. Plaintiffs had 'budgeted' into their business overhead-costs the estimated monthly/yearly totals originally provided to them by defendants (i.e - detrimental reliance based upon promises/assurances by the defendants). However, the January 2015 premium invoice of $683,268 was far above what the plaintiffs had been informed that their estimated Workers' Compensation premiums would costs for the entire year (see ¶ 160 above; the "estimated annual premium" for Workers' Compensation coverage under the RPA was $420,235, which was eclipsed by the $683,268 January 2015 invoice).

168. Given that plaintiffs could no longer afford the RPA Workers' Compensation coverage program, they did not pay defendants' January 2015 invoice in the amount of $683,268.

169. The plaintiffs refused to pay this inflated and exorbitant amount, and considered such amounts demanded to be a material breach of the RPA contract/program, as well as a breach of the covenant of good-faith and fair-dealings found in all contracts.

170. Plaintiffs insurance coverage with the defendants was cancelled as of March 22, 2015 (*see* **EXHIBIT "H"**, for UA INC / AUCRAC's letter dated February 19, 2015).

171. Subsequently, on April 21, 2015, the defendants send a letter to plaintiffs with a demand for payment in the amount of $2,560,790.75 (*see* **EXHIBIT "I"**; pg. 2).

172. The $2,560,790.75 demanded by the defendants represented a claim for $1,591,138.75 for the premiums owed for January, February and March of 2015, as well as a cancellation fee of $969,652.00 (*see* **EXHIBIT "I"**, pg. 1).

173. Please note that in the first three-months of the third-year of the RPA Workers Compensation policy period, the plaintiffs had already paid the defendants $512,445 for premiums, and such amount eclipsed the 'total estimated premium' (as listed on the CNI and CIC policies), which lists the combined 'estimated total premiums' of $420,235 (*please see* ¶ 160 above).

174. The insurance premium calculations used by the defendants in the RPA program are arcane and unintelligible. The calculations are so complex that there has been

a Federal Patent was issued to the defendants for their premium calculations formula (*see* **EXHIBIT "J"**).

175.   These calculations are designed to be confusing and unintelligible, so that their insureds <u>cannot</u> interpret them to verify that the premiums they are being charged are accurate and justified, which are in violations of NY Ins. Laws §§ 2305, 2305, 2314, 2319, 2347, and 3101.

176.   Further, these calculations are designed to be confusing and unintelligible so that when the defendants manipulate them to their advantage (by artificially inflating premiums charged to their insureds), and no one can tell if such premiums being charged are accurate and justified.

177.   Such calculations performed by the defendants under the RPA program are a direct violation of the requirements of NY Ins. Law § 2319, which provides that all the formulas, rates, and calculations used in determining premiums charged to insureds be properly disclosed by the carriers.

178.   The defendants are all owned and operated by the same parent company, and work in conjunction and in conformity with each other to mask the true nature of their business transactions, as well as to skirt and avoid insurance requirements in the State of New York, the State of Nebraska, and other jurisdictions throughout the United States.

179.   Further, the defendants work in conjunction with each other to perpetuate fraud and deceit amongst their insureds (including the plaintiffs herein), such practices include, but are not limited to, fraudulent inducement, wire-fraud, promissory fraud, unfair and deceptive business practices, and the like.

180. The defendants CIC, CNI and AUCRAC are all owned by the same parent company, North American Casualty Co. (a non-party), and are all operated out of the same location in Omaha, Nebraska (*see* **EXHIBIT "K"**, pg. 3).

181. In turn, North American Casualty Co. is owned and operated by defendant AU INC. (*see* **EXHIBIT "K"**, pg. 3).

182. AU INC. is wholly owned and operated by AU Holding Company, Inc. (*see* **EXHIBIT "K"**, pg. 3).

183. Notably, AU Holding Company, Inc. is owned an operated by Berkshire Hathaway, Inc., whose principal owner is Warren E. Buffet (*see* **EXHIBIT "K"**, pg. 3).

184. All of the defendants are operated out of the same building located at 10805 Old Mill Rd, Omaha, NE 68154.

185. Further, all of the defendants have an almost identical Board of Directors.

186. Due to the nature of a 'true' reinsurance arrangement as found in the insurance industry (i.e. - risk transfer to another insurance company for any initial loss sustained by the initial insured), a 'ceding insurance company' is to be separate, distinct, and mutually exclusive from the 'reinsurance carrier'.

187. However, here, all of the defendants are all owned, operated, managed, and organized by the same umbrella company and/or the same Board of Directors, and operate out of the same location (i.e. - collusion)(attached hereto as **EXHIBIT "M"** is the cover page and signature page of the Reinsurance Agreement between AUCRAC and CIC, dated July 1, 2005 - *please notice* that the president of both companies is Steven Menzies).

## APPLICABLE LAWS AND INSURANCE REGULATIONS

188.   NY Ins. Laws §§ 1102 and 1214 requires that all insurance carriers, reinsurance carriers, and insurance brokers/agents be licensed in the State of New York before being able to transact business in New York State, in order to avoid "misleading the public".

189.   Additionally, NY Ins. Law § 2102 prohibits insurance brokers/agents from operating within the State of New York without being licenced and authorized by the New York State Department of Financial Services (formerly the New York State Department of Insurance).

190.   On information and belief, the defendants are not licensed in the State of New York to operate as an insurance carrier and/or reinsurance carrier and/or insurance brokers/agents.

191.   Further, NY Ins. Law § 2117 prohibits a licensed insurance carrier (here, CNI) to act on behalf of an unlicenced insurance carrier (here, CIC, AU INC. and AUCRAC, ARS, INC., and ARS AGENCY) in order to solicit, write, issue, and deliver insurance policies within the State of New York.

192.   NY Ins. Law § 2123 prohibits misrepresentations, misleading statements, incomplete comparisons and/or false information by an insurance carrier, reinsurance carrier, and/or insurance brokers/agents to induce a party from forfeiting or surrendering an insurance policy.

193.   Pursuant to NY Ins. Law § 2318, reinsurance agreements are prohibited in New York relating to Workers' Compensation coverage.

194.   Here, in October of 2012, the defendants required the plaintiffs to utilize their own insurance coverage exclusively throughout the Untied State for Workers

Compensation insurance.

195.  At this time, the plaintiffs were utilizing the New York State Insurance Fund for Workers' Compensation insurance coverage within the State of New York.

196.  Based upon the estimates and representations made by the defendants (as to saving money on their insurance premiums under the RPA program, the reduced costs of their annual premiums, and the estimated annual premiums provided by the defendants), the plaintiffs forfeited and surrendered their insurance policy coverage with the New York State Insurance Fund, as well as based upon the defendants' demands that they solely be the Workers' Compensation carrier to provide for ubiquitous coverage throughout the United States for the plaintiffs.

197.  NY Ins. Law § 2403 prohibits insurance carriers and/or reinsurance carriers and/or entities/corporations/organizations (including insurance brokers/agents) from conducting "unfair and deceptive acts or practices".

198.  NY Ins. Law § 2402 defines violations of NY Ins. Laws §§ 1102, 1214, 2102, 2117, and 2123 as a violation of the prohibited acts in New York State relating to insurance services provided by carriers, brokers, and agents.

199.  Since the defendants have violated acts which are prohbited under NY Ins. Law § 2402, they have therefore explicitly *per se* engaged in activities acknowledged by the State of New York as "unfair and deceptive acts or practices." See NY Ins. Laws §§ 2401 and 2403.

200.  Additionally, New York State Insurance Laws and Regulations prohibits an insurance carrier from setting their own rates to determine premiums charged under Workers' Compensation insurance policies. *See* NY Ins. Laws §§ 2304, 2305(b), 2313(t)(5), 2314, 2319, 2324, 2339(b), 2347, 2404(e) and (f), and 11

NYCRR §§ 151-1.0 and 151-1.2.

201.   Lastly, any insurance policies which have policy terms and conditions which are contrary to protections found in New York State Insurance Law and Insurance Regulations will have their policies "conform" to the requirements and protections of New York State Insurance Laws and Insurance Regulations. *See* NY Ins. Law § 3103.

## CAUSES OF ACTION

### COUNT ONE
*(Declaratory Judgment Relief -*
*Voiding Premiums and Reforming the Contract*
*to Conform to NYS Workers' Compensation Laws and Regulations)*

202.   Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "201" above with the same force and effect as if more fully set forth herein.

203.   NY Ins. Laws §§ 2304(e) and (f), 2305(b), 2313(t)(5), 2314, 2319, 2324, 2339(b), 2347, 2404(e) and (f), and 11 NYCRR §§ 151-1.0 and 151-1.2, require that any premiums charged, and rates used for such calculations, to insureds for Workers' Compensation policies be promulgated by the New York Compensation Insurance Rating Board (hereinafter, "NY CIRB"), and approved by the Superintendent of the New York State Department of Financial Services (hereinafter, "NYS DFS").

204.   The calculations and rates the defendants used within the RPA program to charge premiums to the plaintiffs for Workers' Compensation coverage do not conform to any of the rates used by NY CIRB and/or have been approved by the Superintendent of the NYS FDS (*see* 11 NYCRR § 151-1.2).

205. Since the rates used by the defendants to charge premiums to the plaintiffs for Workers' Compensation coverage were not approved rates, they are therefore *prima facie* illegal.

206. Since the premiums charged by the defendants were illegal, plaintiffs respectfully request that his Court issue a declaration, pursuant to CPLR § 3001, that any and premiums previously charged to the plaintiffs be refunded back in-full, as well as all the premiums and monetary amounts allegedly stilled owed by plaintiffs to the defendants should be declared null and void.

207. Further, given that the premium calculations under the RPA program do not conform to the rates used by the NYS CIRB and approved by the Superintendent of the NYS FDS, plaintiffs respectfully request that this Court issue a declaration, pursuant to CPLR § 3001, that any and all premiums previously charged to the plaintiffs be refunded back in-full, as well as premiums plaintiffs allegedly owe to the defendants for January, February and March of 2015 should be declared null and void.

208. Moreover, any 'early cancellation' penalty demanded by the defendants should also be declared null and void by this Court.

209. Further, any alleged breach by the plaintiffs under the RPA (for failing to pay the charged premiums), were initially and primarily caused by the defendants' actions which were a breach of the contract terms to provide "costs savings" Workers' Compensation insurance coverage. Instead, the defendants purposely inflated the premiums charged to the defendants (using manipulated premium calculations), which were grossly out of proportion with the 'estimates' originally provided, as well as grossly inflated premiums which were not based in fact or logic, designed to

induce the plaintiffs to default on their premium payments. Therefore, any penalty charges to the plaintiffs should be declared null and void, due to the defendants' actions in causing the plaintiffs to default on any amounts owed.

210. In the alterative, should this Court not declare that the premiums charged and allegedly due by plaintiffs to the defendants are null and void, the plaintiffs therefore respectively request that the RPA agreement be reformed from its inception date, and that the rate calculations for premiums charged under the RPA program conform to the requirements of the rates to be used for Workers' Compensation premiums as espoused by the NY CIRB and approved by the Superintendent of the NYS FDS, using premium calculations traditionally used within the insurance industry.

### COUNT TWO
*(Declaratory Judgment Relief -*
*Declaring that the RPA Agreement is Not Reinsurance)*

211. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "210" above with the same force and effect as if more fully set forth herein.

212. NYS Ins. Law § 3103 requires that all insurance policies solicited, written, issued, and delivered within New York State conform to the requirements of NY State Insurance Laws and Insurance Regulations of the NYS DFS.

213. The RPA, CIC and CNI policies provided by the defendants to the plaintiffs were solicited, written, issued, and delivered within the State of New York, to New York residences and/or New York corporations/companies.

214. The RPA agreement explicitly provides that it will provide for Workers' Compensation insurance coverage to the plaintiffs.

215. By mislabeling the RPA agreement as a 'reinsurance agreement', the defendants have purposely attempted to skirt and avoid the legal requirements and consumer protections of New York State Insurance Laws and New York Insurance Regulations.

216. First, reinsurance agreements occur between insurance carriers; here, the defendants attempt to characterize a reinsurance agreement under the RPA between the initial insureds (the plaintiffs) and AUCRAC. By definition, a reinsurance agreement cannot include the initial insured(s) in the transaction, as reinsurance transactions are limited to be between two insurance carriers.

217. Secondly, assuming that the RPA agreement is indeed a reinsurance agreement (which is denied by the plaintiffs herein), such reinsurance agreements are prohibited to be used for Workers' Compensation insurance coverage in New York State. *See* NY Ins. Law § 2318.

218. Therefore, pursuant to CPLR § 3001, plaintiffs herein are entitled to a declaration from this Court that the RPA is not a reinsurance agreement, and therefore is indeed subject to the New York State Insurance Laws and Insurance Department Regulations governing insurance agreements, and more specifically Workers' Compensation insurance policies.

## COUNT THREE
*(Declaratory Judgment Relief -*
*Voiding the Arbitration Provisions)*

219. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "218" above with the same force and effect as if more fully set forth herein.

220. Under the RPA agreement, there is a provision that Nebraska law would govern the contractual relationships between the parties (*see* **EXHIBIT "A"**, pg 5, ¶ 16)(*please note* that this choice-of-law provision is separate, distinct and apart from any obligations and consumer protections under the NYS Insurance Laws and NYS DFS Insurance Regulations, for polices solicited, written, issued, and delivered within the jurisdiction of New York State).

221. Further, the RPA also had a clause that any controversies concerning the RPA program would be submitted to a binding arbitration in the British Virgin Islands (*see* **EXHIBIT "A"**, pg. 3-4, ¶ 13[a] and [b])

222. In addition to the RPA arbitration clause, there was also another arbitration clause found in the insurance binder agreement to the policy (*see* **EXHIBIT "L"**, *Request to Bind Coverages & Services*, dated October 8, 2012; hereinafter "BINDER").

223. However, Nebraska law explicitly prohibits enforcement of any arbitration clauses relating to insurance disputes.

224. Nebraska Revised Statute § 2602.01(f)(4) voids any arbitration clause within "any agreement concerning or relating to an insurance policy."

225. Given that the current dispute before this Court concerns "an agreement concerning or relating to an insurance policy", then the arbitration clauses within the "RPA" and "BINDER" are *prima facie* void.

226. As noted by the Nebraska Supreme Court in Speece v. Allied Professionals Ins. Co., 289 Neb. 75 (2014), "Section 25-2602.01(f)(4) provides that, with certain exceptions not relevant to the present case, an arbitration provision **is not valid and enforceable** in 'any agreement concerning or relating to an insurance policy.' " Id., at pg. 78.

227. Further, under Nebraska's State Constitution, Article 1, § 3, states that a party will be allowed to adjudicate any legal claims in a court of law, and that where an arbitration agreement is revokable under "such grounds as exists at law or in equity", the courts shall not enforce such arbitration agreements.

228. Here, the defendants' fraudulent acts against the plaintiffs to induce them to entering into the RPA program, as well as fraudulent concealment, and fraudulent actions during the RPA program itself (in purposely manipulating premiums charged to the plaintiffs), thereby voids *ab initio* the enforcement of all contractual obligations under the RPA and BINDER.  Mich. Nat'l Bank-Oakland, 89 N.Y.2d 94, 108-109 (NY, 1996); and Turbines Ltd. v. Transupport, Inc., 285 Neb. 129, 138 (Neb., 2013).

229. Therefore, pursuant to CPLR § 3001, plaintiffs herein are entitled to a declaration from this Court that the arbitration clauses within the RPA and BINDER are *prima facie* void and unenforceable, and further, that the controversies between the parties herein shall be adjudicated by this Court.

**COUNT FOUR**
*(Fraud - Over-Billing and Manipulation of Premiums)*

230. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "229" above with the same force and effect as if more fully set forth herein.

231. The defendants herein intentionally and fraudulently manipulated the premium calculations they were charging the plaintiffs in order to increase the amounts paid into the 'segregated cell'.  This was especially true during the last few months of the second year of the RPA program, as well as the first few months of the third-

year of the RPA program.

232.  On information and belief, the defendants have purposely overcharged all of their insureds in the last year of the RPA program with inflated premiums in order to retain as much money as possible, without the intent to ever refund any monies back to their insureds.  This is done to artificially inflate each insureds' segregated cells, so that such 'reserves' can be invested and used as capital for income generated solely to benefit the defendants, without sharing any interests or profits with the plaintiffs (whom are insureds of the defendants, are involved in a "profit-sharing" program with the defendants, and it is the plaintiffs monies which are being held and used by the defendants as investment capital).

233.  Further, on information and belief, the defendants have never provided to their insureds (throughout the United States) any refunds for their remaining monetary amounts due under the RPA program in their segregated cells after their RPA program(s) ended.

234.  The defendants represented to the plaintiffs that they would only be charged premiums 'reasonably related' to their open Workers' Compensation claims. However, the premiums actually charged had no rational basis to the Workers' Compensation claims made by the plaintiffs employees.

235.  Here, the defendants knew that they the RPA program calculations used would be manipulated to the defendants advantage, and to the detriment and prejudice of the plaintiffs, yet still solicited and sold the RPA program to the plaintiffs claiming that there would be a "cost savings", "low premiums charged", and a "rebate back" to the plaintiffs at the end of the program (i.e. - a "profit-sharing program" involving Workers' Compensation insurance coverage).

236. Due to the knowingly false statements and purposeful deception targeted at the plaintiffs and to and to public at large, the plaintiffs have incurred pecuniary losses, overcharges on premiums, and demands for additional monies by the defendants under the RPA program.

237. Therefore, due to the defendants' fraudulent actions, the plaintiffs are entitled to a full refund of any and all monies paid to the defendants under the RPA program, as well as voiding any monies that the defendants claim they are still owed under the RPA program.

238. Due to the defendants' fraudulent misrepresentations and wrongful actions against the plaintiffs that caused them to enter into the RPA program, the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into their 'segregated cell' with the defendants, refunding of any amounts the plaintiffs were overcharged by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action.

## COUNT FIVE
### (*Fraudulent Inducement*)

239. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "238" above with the same force and effect as if more fully set forth herein.

240. The defendants provided the plaintiffs with knowingly false estimates of future premiums for Workers Compensation coverage in order to induce the plaintiffs into purchasing into the RPA program.

241. Additionally, the defendants provided the plaintiffs with knowingly false assurances that they would receive refunds of unused premiums from their 'segregated cell' at the end of the policy period and/or end of their open Workers' Compensation claims. However, on information and belief, the defendants never had any intention to refund any amounts to the plaintiffs at the end of the RPA program, as the defendants have never provided any refunds to any of their insureds throughout the United States under any RPA Workers' Compensation program/agreement.

242. Moreover, the defendants made material omissions of fact to the plaintiffs concerning their premium calculations and the true amount of what would be due under the RPA program, which allowed the defendants to artificially inflate the premiums due during the course of the RPA program, and in violation of NY Ins. Laws §§ 2314 and 2319.

243. The plaintiffs relied upon the defendants' false assurances as to the estimated amounts of their premiums to the plaintiffs' detriment, and have incurred amounts due of some $2,560,790.75, plus interest, as well as over $1,967,861 in overcharges during the RPA program.

244. Further, the defendants were not authorized to solicit, writte, issue, and deliver Workers' Compensation insurance policies within the State of New York, and/or were not authorized to transact business as insurance brokers/agents within the State of New York.

245.  The defendants purposely expressed to the plaintiffs that they were authorized to be insurance brokers and/or agent and/or solicit, write, issue, and deliver insurance policies in the State of New York, and such expressions were clearly false. Such statements were conveyed to the plaintiffs in order to induce them to entering into the RPA program.

246.  Had the plaintiffs known that the defendants were not authorized to solicit, write, issue, and deliver Workers' Compensation insurance policies within the State of New York, and/or were not authorized to transact business as insurance brokers/agents within the State of New York, the plaintiffs would have not entered into the RPA program with the defendants.

247.  Therefore, due to the defendants' fraudulent inducement and wrongful actions against the plaintiffs that caused them to enter into the RPA program, the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into their 'segregated cell' with the defendants, refunding of any amounts which the plaintiffs were overcharged by the plaintiffs in premiums, awarding the plaintiffs punitive damages due to the willful and egregious conduct directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to plaintiffs for commencing this current action.

**COUNT SIX**
(*Fraudulent Concealment*)

248.   Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "247" above with the same force and effect as if more fully set forth herein.

249.   The defendants fraudulently and knowingly concealed the true nature of the RPA program from the plaintiffs, both prior to the plaintiffs entering into the program and after the plaintiffs were enrolled in the RPA program with the defendants.

250.   The defendants fraudulently and knowingly concealed the true nature of the premium calculations and/or altered the premiums the plaintiffs paid into the segregated cells to their own advantage, and in such a way so that the plaintiffs could not verify that the premiums being charged were accurate and justified.

251.   The defendants fraudulently and knowingly concealed the fact that they had no intention of ever refunding any monies due back to the plaintiffs at the end of the RPA program.

252.   The defendants had a duty to disclose to the plaintiffs the true nature of the RPA program prior to the plaintiffs entering into the RPA program.

253.   The defendants had a duty to disclose to the plaintiffs the true nature of the premium calculations prior to, and during, the plaintiffs participation in the RPA program.

254.   The defendants had a duty to disclose to the plaintiffs that none of their insureds who had previously been enrolled in the RPA Workers' Compensation program had ever been refunded any monies out of their 'segregated cells', and it was highly unlikely, if not improbable, that the plaintiffs would ever be refunded any

monies the defendants were holding in their segregated cell.

255. Further, the defendants purposely concealed to the plaintiffs that they were not authorized insurance brokers/agents in the State of New York, and/or were not authorized insurance carriers to solicit, write, issue, and deliver insurance policies.

256. The defendants had an obligation to disclose such information to the plaintiffs prior to entering into the RPA program.  Such statements were concealed to the plaintiffs in order to induce them to enter into the RPA program.

257. Had the plaintiffs known that the defendants were not authorized to solicit, write, issue, and deliver Workers' Compensation insurance policies within the State of New York, and/or were not authorized to transact business as insurance brokers/agents, the plaintiffs would have never entered into the RPA program.

258. Even assuming that the defendants did not have any fiduciary obligation and/or affirmative duty to the plaintiffs, the defendants still had special knowledge and/or information concerning the true nature of their status (i.e. - failure to be authorized in the State of New York to issue policies and/or be insurance brokers/agents) and/or the RPA program, and premium calculation formula, which was not attainable to the plaintiffs, and the defendants should be held liable for their failure to disclose such information, which resulted in pecuniary loss to the plaintiffs.

259. Therefore, due to the defendants' fraudulent concealment and wrongful actions against the plaintiffs that induced them to enter into the RPA program, the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding of any overcharges the plaintiffs paid as premiums, awarding the

plaintiffs punitive damages due to the willful and egregious conduct directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio,* as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action.

## COUNT SEVEN
### (*Fraudulent Misrepresentation*)

260. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "259" above with the same force and effect as if more fully set forth herein.

261. The defendants provided the plaintiffs with knowingly false misrepresentations of the estimates of future premiums for Workers Compensation coverage.

262. Additionally, the defendants provided the plaintiffs with knowingly false assurances that they would receive refunds of unused premiums from their 'segregated cell' at the end of the policy period and/or end of the open Workers' Compensation claims. However, on information and belief, the defendants never had any intent to refund any amounts to the plaintiffs at the end of the RPA program, as the defendants have never provided any refunds to any of their insureds throughout the United States under any RPA Workers' Compensation program/agreement.

263. Moreover, the defendants made material misrepresentations and/or omissions of fact to the plaintiffs concerning their premium calculations and/or the true amount of what would be charged as premiums under the RPA program, which allowed the defendants to artificially inflate the premiums charged to the plaintiffs during the course of the RPA program.

264. The plaintiffs detrimentally relied upon the defendants' false misrepresentations and/or assurances as to the estimated amounts of their premiums, and were overcharged some $1,967,861, in addition to demand for payments by the defendants for an additional $2,560,790.85, plus penalties and interest.

265. Further, the defendants fraudulently misrepresented to the plaintiffs that they were authorized to operate as insurance brokers/agents in the State of New York, and/or were authorized insurance carriers to solicit, write, issue, and deliver insurance policies, when they were not actually authorized to be insurance brokers/agents and/or insurance carriers. Such misrepresentation were purposely made so that the plaintiffs would enter into the RPA program.

266. The defendants had an obligation to correct such misrepresentations to the plaintiffs prior to entering into the RPA program.

267. Therefore, due to the defendants' fraudulent misrepresentations and wrongful actions against the plaintiffs that caused them to enter into the RPA program, the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding of any overcharges the plaintiffs paid in premiums, awarding the plaintiffs punitive damages due to the willful and egregious conduct by the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action.

## COUNT EIGHT
(*Breach of Contract*)

268.    Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "267" above with the same force and effect as if more fully set forth herein.

269.    Pursuant to the terms of the original agreement, and based upon the implicit and explicit explanations, assurances, and descriptions by the defendants, the plaintiffs were to have been provided a Workers' Compensation program which would save them money, and provide reduced premiums on Workers' Compensation coverage. Further, such amounts charged were to be refunded to the plaintiffs at the end of the RPA program and/or when the last open Workers' Compensation claim was closed (i.e. - the "profit-sharing plan").

270.    The defendants here breached the intent and terms of the RPA agreement by actually charging premiums to the plaintiffs at outrageously higher amounts than originally estimated by the defendants themselves.

271.    Pursuant to contract principals, the defendants were obligated to only charge the plaintiffs premiums for their Workers' Compensation insurance coverage which were reasonably related to the open Workers' Compensation claims. However, as noted above, the defendants purposely manipulated the calculations charged to the plaintiffs in order to benefit themselves, with no intent to ever refund such amounts.

272.    The plaintiffs were promised costs savings on their Workers' Compensation claims, and reduced premiums relating to their Workers' Compensation policy coverage (the 'benefit of the bargain'), instead the plaintiffs were actually

overcharged (i.e. - there was a material breach of the terms of the agreement between what the defendants promised and/or assured to the plaintiffs, and what the defendants actually provided under the PRA program).

273. Further, the premiums actually charged to the plaintiffs by the defendants were exponentially inflated in comparison with the initial estimates the defendants quoted the plaintiffs.

274. Additionally, the reserves set by the defendants (and in turn, inflated premiums charged, and held in the 'segregated cell'), were artificially and improperly inflated without justification in fact or logic.

275. Lastly, the CIC and CNI policies had contractual obligations that they both would pay Workers' Compensation claims on behalf of the plaintiffs ("We will pay promptly when due the benefits required of you by the workers compensation law"), for which neither carrier paid any amounts for any such claims.  Instead, the plaintiffs were paying such amounts out of their 'segregated cell'.

276. Since both CIC and CNI did not actually pay for any such benefits they were contractually required to provide, and the plaintiffs, in turn, paid for such amounts out of their 'segregated cell', then both CIC and CNI are required to reimburse the plaintiffs for any monies that they were required to pay out, pursuant to the policies terms and conditions.

277. Therefore, due to the defendants' breach of the material terms and spirit/intent of the RPA program and wrongful actions against the plaintiffs that caused them to enter into the RPA program, the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into

the 'segregated cell' with the defendants, refunding of any overcharges the plaintiffs paid in premiums, reimbursing of any monies that the plaintiffs paid out in Workers' Compensation benefits that CIC and CNI were contractually obligated to provide, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as award legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action.

## COUNT NINE
*(Breach of Covenant of Good faith and Fair Dealing)*

278.   Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "277" above with the same force and effect as if more fully set forth herein.

279.   In New York, the implied covenant of good faith and fair dealings in the course of performance "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (ABN AMRO Bank, N.V. v MBIA Inc., 17 N.Y.3d 208, 228 [2011]), as well as "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." (Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 [1995], *quoting* 5 Williston, Contracts § 1293, at 3682 [rev. ed. 1937]).[5]

---

5

"The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the

280.   Further, under the common law principals of the covenant of good faith and fair dealings, a contract should not give one party an unfair or unreasonable advantage over the other generally. "[A] result [which] would put one party to this contract at the absolute mercy of the other [should be avoided by the courts]. Such a construction is abhorrent to the law and will not be followed, and this is especially so where the agreement, as here, is prepared by the party seeking to benefit by such construction." Price v. Spielman Motor Sales Co., 261 A.D. 626, 629 (2d Dept., 1941). See also, Lowy & Donnath, Inc. v. New York, 98 A.D.2d 42, 45 (1st Dept., 1983). "Good faith performance excludes an "abuse of a power to specify terms." City of Scottsbluff v. Waste Connections of Neb., Inc., 282 Neb. 848, 877 (Neb., 2011), quoting, Restatement (Second) of Contracts, note 2, § 205, comment d. at 101.

281.   Here, the plaintiffs were promised and assured via the defendants' representations concerning the RPA program that they would be provided 'cost effective' insurance, not only to reduce the costs of their open Workers' Compensation claims, but also to reduce their insurance premiums and a refund of any amounts leftover in their 'segregated cell' at the end of the RPA program.

282.   Further, due to the defendants' manipulation of the premium calculations, and having premium calculations which were purposely confusing and complex to be understood under any reasonable interpretation and/or by any reasonable businessman, the plaintiffs were impeded in their ability to receive the benefits of the bargain by the defendants (i.e. - reduced and affordable insurance premiums).

---

justifiable expectations of the second party. A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract." RSUI Indem. Co. v. Bacon, 282 Neb. 436, 444 (Neb., 2011).

283.   Additionally, by defendants' intentionally inflating of the Workers' Compensation premiums in the last year of the RPA program, the defendants have **purposely** thwarted the plaintiffs ability to continue paying the monthly premiums due, given that the estimates of monthly and yearly premiums provided by the defendants were grossly out of proportion with what was actually being charged (i.e. - the defendants' actions caused the inability of the plaintiffs to pay the exponentially inflated premiums being charged).

284.   The ability of the defendants to manipulate the premiums charged to the plaintiffs (which were out of proportion with what was promised to the plaintiffs), and the inability for the plaintiffs to verify and ensure that the premium calculations were accurate and proper, provided the defendants with too much power over the plaintiffs, and puts the plaintiffs "at the mercy" of the defendants under the RPA program (i.e. - unconscionability).

285.   Also, under the RPA program, the premiums charged to the plaintiffs were somehow connected to the 'insurance reserves' setup by the defendants for each of the open Workers' Compensation claims made by the plaintiffs' employees.

286.   However, the defendants here established their 'reserves' at a grossly inflated amount, which was out of proportion with the actual 'estimated value' of the open Workers' Compensation claims.  These inflated reserves (and in turn inflated premiums being charged to the plaintiffs), were done so that the segregated cell would be larger than it reasonably needed to be, and such amounts were to be held by the defendants (so they could invest such monies), and with the intention to refunded back to the plaintiffs at a later date.

287.   However, as noted above, the defendants never had any actual intention of making any refunds to the plaintiffs of the amounts leftover in their segregated cell, and therefore the defendants inflating of the reserves (which was out of any reasonable justification with the open claims), resulted in extremely large premiums being charged to the plaintiffs.

288.   Moreover, the defendants purposely left open Workers' Compensation claims, so that the reserves on each claim would be higher (i.e. - the higher the reserves, the higher the premium, and the larger the segregated cell, which would never be refunded to the plaintiffs).

289.   On numerous occasions, the plaintiffs informed the defendants (via an outside private claims adjuster hired by the plaintiffs), that certain claimants/employees had returned to work, were no longer disabled/injured, and/or were no longer eligible to receive Workers' Compensation benefits (i.e. - the claims should be closed, or at the least investigated and scrutinized).

290.   However, the defendants, through their in-house adjusters for Workers' Compensation claims, refused to investigate the claims (based upon information provided by the plaintiffs), to purposely keep open Workers' Compensation claims for longer than they should have, resulting in increased costs to the plaintiffs through larger reserves being set by the defendants, and in turn larger premiums being charged to the plaintiffs.

291.   Due to the actions and/or inactions by the defendants, they have violated the implied covenant of good faith and fair dealings, and therefore the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of

any monies the plaintiffs previously paid into their 'segregated cell' with the defendants, refunding of any overcharges the plaintiffs paid in premiums, awarding the plaintiffs punitive damages due to the willful and egregious conduct by the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses fo the plaintiffs for commencing this current action.

## COUNT TEN
### (*Unjust Enrichment*)

292. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "291" above with the same force and effect as if more fully set forth herein.

293. As noted above, due to the RPA program and subsequent wrongful actions by the defendants, the plaintiffs have incurred debts and pecuniary liabilities, which were outside of the scope and intent of the original bargain for exchange between the parties.

294. The defendants were also unjustly enriched at the plaintiffs' expense and detriment, due to the actions by the defendants subsequent to the plaintiffs entering into the RPA program.

295. It would be against equity and good conscious to permit the defendants to retain any monies under the RPA program, especially in light of the fact that the defendants were not authorized to be insurance brokers/agents in the State of New York, were not authorized to write insurance policies in the State of New York, and the premiums charged to the plaintiff were not congruent to the Workers' Compensation premium rates proscribed by the NY CIRB and approved by the

Superintendent of the NYS FDS.

296.    Therefore the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding any amounts the plaintiffs were overcharged in premiums, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as award legal costs, attorneys' fees, and expenses to plaintiffs for commencing this current action.

### COUNT ELEVEN
*(Declaratory Judgment Relief -*
*Return of Monies in the Segregated Cell*
*Related to Closed Workers' Compensation Claims)*

297.    Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "296" above with the same force and effect as if more fully set forth herein.

298.    Pursuant to the RPA agreement, the defendants would retain monies set-aside as reserves in the plaintiffs' segregated cells for several years after a Workers' Compensation claims were closed, in case any claims were later re-opened by the employee-claimants.

299.    However, some of these Workers' Compensations claims were closed under a settlement with the claimants, and the claimants waived their rights to re-open their claims in the future.

300. For such claims, any amounts set-aside as reserves in the plaintiffs' segregated cell should be refunded at this time, as there is no justification or basis to retain such amounts by the defendants.

301. Therefore, pursuant to CPLR § 3001, plaintiffs respectfully requests that this Court provide a declaration that the plaintiffs are immediately entitled to any and all funds held in reserves in their segregated cell held by the defendants, for any and all Workers' Compensation claims for which the claim(s) have been settled with a permanent waiver of any future re-opening by the claimants, and such monies to be returned with statutory interest.

## COUNT TWELVE
*(Declaratory Judgment Relief -*
*Return of Monies in the Segregated Cells with Statutory Interest)*

302. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "301" above with the same force and effect as if more fully set forth herein.

303. The defendants have purposely created a scheme by which they would inflate the amounts being charged to the plaintiffs, purposely keep open Workers' Compensation claims, enlarge and balloon the reserves being held, and delay in returning monies to the plaintiffs from their segregated cell, so that the defendants could be advantaged with the monies wrongfully held, thereby allowing the defendants to invest such amounts, with no real intention of refunding any amounts to the plaintiffs (nor sharing in the interests/profits the defendants had accumulated using the plaintiffs monies).

304. Such amounts being kept by the defendants should be returned to the plaintiffs from their segregated cell with statutory interest, given that the defendants have

wrongfully withheld such monies properly belonging to the plaintiffs, have inflated the amounts being held in the plaintiffs' segregated cell, have prolonged and delayed the time for which the segregated cell monies will be returned, and all the while the defendants have been using such amounts as investment capital to accumulate profit on interest with monetary returns for the sole benefit of the defendants (i.e. - contrary to a profit-sharing program).

305. Given that the defendants are holding the plaintiffs' monies in a segregated cell, with the explicit agreement that such amounts would eventually be returned, the plaintiffs have a right to receive benefits on the assets held by another party, that being the statutory interest on the monies the defendants are currently holding of the plaintiffs, especially in light of the defendants' improper actions against the plaintiffs during the course of the RPA program.

306. Further, in withholding monies from the plaintiffs that are clearly theirs, and being held by the defendants in the segregated cell, the plaintiffs have lost the benefit of due use of their own money.  "The intent of the statute awarding interest is to indemnify the plaintiffs for the non-payment of what is due to them. Hence, the delay in the rendition of damages may properly be charged against the party causing it, in considering the allowance of interest, and the courts have followed this rule in applying the terms of the statute." Trimboli v. Scarpaci Funeral Home, Inc., 37 A.D.2d 386, 389 (2d Dept., 1971).

307. Therefore, pursuant to CPLR § 3001, plaintiffs respectfully requests that this Court provide a declaration that any monies returned to plaintiff from their segregated cell shall be returned with statutory interest.

## COUNT THIRTEEN
(*Negligence*)

308.   Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through 307" above with the same force and effect as if more fully set forth herein.

309.   Given that the plaintiffs purchased Workers' Compensation policies from the defendants, the defendants were obligated, and had a duty, to pay the plaintiffs' employees' Workers' Compensation claims.

310.   Pursuant to the explicit written terms of both the CIC and CNI policies, each carrier agreed, "We will pay promptly when due the benefits required of you by the workers' compensation law." However, neither CIC or CNI ever paid any amounts from their policies on behalf of the plaintiffs for the plaintiffs' employees' Workers' Compensation claims.

311.   The defendants breached their contractual obligations and duties under the Workers' Compensation Laws to pay such Workers' Compensation claims on behalf of the plaintiffs.

312.   Instead, the monies used to pay such claims were paid by the plaintiffs themselves out of their segregated cell being held by the defendants.

313.   As a result of the defendants failing to pay such monies out of their insurance policies (even after the plaintiffs had purchased these insurance policies from the defendants, but instead paying such claims out of the plaintiffs' segregated cell), the plaintiffs have incurred pecuniary losses over the last few years, and therefore should be repaid any and all monies wrongfully taken out of their segregated cells for their employees' Workers' Compensation claims.

314.  Therefore the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into their 'segregated cell' with the defendants, refunding any overcharges the plaintiffs paid the defendants in premiums, reimbursing any monies the plaintiffs paid in Workers' Compensation benefits out of their segregated cell for which CIC and CNI were obligated to pay, awarding the plaintiffs punitive damages due to the willful and egregious conduct by the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action.

## COUNT FOURTEEN
*(Unfair Business Practices / Violations of NY Bus. Law § 349)*

315.  Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "314" above with the same force and effect as if more fully set forth herein.

316.  The defendants' actions to solicit and entice the plaintiffs to buy into the RPA program were deceptive and/or misleading.

317.  The defendants failed to properly advise and inform the plaintiffs as to numerous material conditions and terms under the RPA program.

318.  Further, the defendants changed the conditions and terms under the RPA program during the programs' three-year term, including but not limited to, the consistency with which the premiums were being charged to the plaintiffs, using a premiums for Workers' Compensation insurance which did not abide by the amounts set by

the NY CIRB and were approved by the Superintendent of the NYS FDS, and using a premium calculations formula which was purposefully confusing, manipulative, and not related to any basis in logic, nor the plaintiffs 'loss history.'

319. Due to the defendants deceptive and/or misleading actions towards the plaintiffs, the plaintiffs have incurred pecuniary losses during the course of the RPA program, as well as inflated demands for past-due amounts and penalties by the defendants.

320. Additionally, the defendants, in conducting deceptive and/or misleading business practices in the State of New York, have violated consumer protections as found in NY Bus. Law § 349.

321. Therefore the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cells' with the defendants, refunding of any amounts the plaintiffs were overcharged by the defendants in premiums, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action, pursuant to NY Bus. Law § 349(h).

### COUNT FIFTEEN
(*Promissory Fraud*)

322. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "321" above with the same force and effect as if more fully

set forth herein.

323. The defendants made numerous promises and assurances to the plaintiffs that were the basis for plaintiffs entering into the RPA program, such as, but not limited to, reduced premiums being charged, costs savings for Workers' Compensation insurance coverage, refunds of amounts paid into the RPA program and the segregated cell (i.e. - profit-sharing), and Workers' Compensation insurance coverage being provided under the CIC and CNI insurance policies.

324. The plaintiffs reasonably relied upon the defendants' assurances and promises as a material reason for the plaintiffs to enter into the RPA program.

325. However, prior to the plaintiffs entering into the RPA program, the defendants never had any intention of providing reduced premiums to the plaintiffs, nor refunds of any amounts in their segregated cell.

326. As proof of such intent to not perform, the plaintiffs actual incurred greatly increased, and substantially higher, Workers' Compensation premiums under the RPA program than at any time in their past with other Workers' Compensation carriers and Workers' Compensation policies.

327. Further, the premiums actually charged to the plaintiffs under the RPA program were substantially higher than the estimates the defendants provided to the plaintiffs.

328. As a matter of fact, and as noted above, the defendants had prior intent to actually substantially increase the amounts of premiums charged to the plaintiffs (especially in the last year of the program), in order to inflate the reserves set on each of the plaintiffs' Workers' Compensation claims (without any rational basis), increase the amounts held in their segregated cell (to be held for years after the

RPA program ended, and without any interest returned to the plaintiffs), and all with the intent to never return any such amounts to the plaintiffs, despite assurances both before and during the RPA program that the RPA program was a "profit-sharing" agreement.

329. Moreover, in the history of the defendants soliciting the RPA program to insureds throughout the United States, there has been no instance of any of the defendants' insureds being refunded any amounts under their segregated cells in any RPA program.

330. Due to the failure of the defendants to perform, as promised, under the RPA program, the plaintiffs have incurred substantial pecuniary losses.

331. Therefore the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into their 'segregated cell' with the defendants, refunding any overcharges the plaintiffs paid in premiums, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as award legal costs, attorneys' fees, and expenses to plaintiffs for commencing this current action.

## COUNT SIXTEEN
### (*Action for Accounting*)

332. Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "331" above with the same force and effect as if more fully set forth herein.

333.   The defendants, who issued a Workers' Compensation policy to the plaintiffs, were required to use the rates as set by the NY CIRB and approved by the Superintendent of the NYS FDS. (*see* 11 NYCRR § 151-1.2).

334.   Instead, the defendants charged the plaintiffs premiums using calculations which were purposefully confusing, manipulative, and not related to any basis in reason, fact or logic, nor the plaintiffs' 'loss history.'

335.   Additionally, the defendants have misappropriated the plaintiffs monies being held by the defendants in such segregated cell, such actions include, but are not limited to, improperly investigating and closing down open Workers' Compensation claims, purposely overcharging premiums to the plaintiffs, setting the reserves on open Workers' Compensation claims at higher than reasonable amount, using a premium calculations formula which was purposefully confusing and unintelligible, and failing to charge premiums which were set by the NY CIRB and approved by the Superintendent of the NYS FDS.

336.   Therefore, the plaintiffs hereby request that this Court direct an accounting of the premiums charged to the plaintiffs over the three-years of the RPA program, the amounts being held in the plaintiffs' segregated cell, the reserves set and are being held by the defendants for the plaintiffs' employees' Workers' Compensation claims, and other charges the defendants have assessed against the plaintiffs over the course of the RPA program, to ensure such amounts are proper and sufficient.

## COUNT SEVENTEENTH
*(Faux Coverage Under the CIC and CNI Policies as Written)*

337.   Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "336" above with the same force and effect as if more fully set forth herein.

338.   The plaintiffs purchased, and the defendants issued, two Workers' Compensation policies for each of the three-year policy periods with CIC and CNI.

339.   Pursuant to the explicit written terms of both the CIC and CNI policies, each carrier agreed, "We will pay promptly when due the benefits required of you by the workers' compensation law." However, neither CIC or CNI ever paid any amounts from their policies on behalf of the plaintiffs for the plaintiffs' employees' Workers' Compensation claims.

340.   Despite the promise, assurance, and contractual obligation for both CIC and CNI to pay Workers' Compensation claims on behalf of the plaintiffs, neither CIC nor CNI ever made any payments on the plaintiffs' behalf.   Rather, any and all amounts were paid for out of the plaintiffs' segregated cell.  Such actions were in violation of NY WC Law § 54(2) (which requires a Workers' Compensation insurance carriers to pay benefits on behalf of their insured), as well as the terms of the insurance policies.

341.   The defendants colluded and entered into a common scheme where they would issue faux insurance policies by CIC and CNI to the plaintiffs in order to improperly reflect to the appropriate and respective insurance regulatory agencies (in each state that the plaintiffs operated within), that the plaintiffs were being provided Workers' Compensation insurance coverage under the CIC and CNI policies,

when in fact neither CNI or CIC was actually providing any Workers' Compensation coverage whatsoever to the plaintiffs.

342. The CIC and CNI policies were simply issued under false pretenses to fool the state insurance regulatory agencies in each respective state that the plaintiffs operated within, and hide the fact that the RPA program (which was actually providing coverage to the plaintiffs) was in effect and 'actually' settling/paying Worker's Compensation claims, when the RPA program was not approved by any state insurance regulatory agencies in the states that the plaintiffs operated within.

343. Such improper actions were done due to the fact that several of the defendants were not authorized to solicit, write, issue and deliver Workers' Compensation insurance policies in each state, and/or authorized to be insurance brokers/agents.

344. Such actions by the defendants were in explicit violation of the terms of the protections as found in NY Ins. Law § 2117, which prohibits authorized insurance carriers (here, CIC and CNI) to operate on behalf of non-authorized insurance carriers (here, AUCRAC, AU INC., ARS AGENCY, and ARS INC.).

345. Such actions are *per se* "deceptive and unfair practices" as defined by NY Ins. Laws §§ 2401, 2402 and 2403.

346. Since the CIC and CNI insurance policies failed to provide insurance coverage, as promised (pursuant to the explicit terms of the agreement and insurance policy they wrote), the plaintiffs are due and entitled to be reimbursed for any and all amounts provided to the defendants for purchasing of such policies, as well as any monies paid from their segregated cell for open Workers' Compensation claims.

347. Further, due to the defendants dishonest, deceptive, and unfair business practices (in addition to their failure to provide for full disclosure to the plaintiffs as to the true

nature of the RPA program), the plaintiffs respectfully request that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the RPA program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding any overcharges the plaintiffs paid in premiums, reimbursing any monies the plaintiffs paid in Workers' Compensation benefits out of their segregated cell for-which CIC and CNI were obligated to pay, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action.

## COUNT EIGHTEENTH
*(Breach of Fiduciary Duty)*[6]

348.   Plaintiffs repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "347" above with the same force and effect as if more fully set forth herein.

349.   The defendants were retained by the plaintiffs as their insurance broker(s) and/or insurance agent(s) over a long period of time, dating back numerous years.

350.   The plaintiffs depended and relied upon the defendants for specialized knowledge and expertise relating to complex transactions involving their insurance coverage, including purchasing Workers' Compensation policies.

---

[6] *Please note* that plaintiffs herein assert only one cause of action against defendant J.A. FACCIBENE & ASSOCIATES, INC., and that being the Eighteenth Cause of Action, Breach of Fiduciary Duty. All other causes of action outside of the Breach of Fiduciary Duty are hereby waived and withdrawn as against J.A. FACCIBENE & ASSOCIATES, INC. only. Beyond defendant J.A. FACCIBENE & ASSOCIATES, INC.; the Eighteenth Cause of Action for Breach of Fiduciary Duty is <u>also</u> being asserted against all other defendants listed herein.

351.  The plaintiffs depended and relied upon the defendants' information and suggestions regrading their insurance coverage, including but not limited to their Workers' Compensation insurance coverages and the RPA program.

352.  The defendants solicited and sold plaintiffs the RPA program without fully informing the plaintiffs the ramification of such program and insurance coverages/insurance policies, including but not limited to, how the program worked, how the claim reserves were setup, how the claims were paid out, that the amounts in the segregated cell would be kept for years after the RPA program ended, that the defendants would not be returning any amounts from the segregated cell, that the defendants were not authorized to solicit, write, issue and deliver insurance policies within the State of New York, the details of how the calculations used would establish the monthly premiums being charged, and that the RPA program did not use rates in their premium calculations which were set by NY CIRB and/or have been approved by the Superintendent of the NYS FDS.

353.  The plaintiffs entirely relied upon the defendants information, expertise, experience and specialized knowledge as basis for entering into the RPA program.

354.  By entering into the RPA program, the plaintiffs have incurred unnecessary expenses and pecuniary losses.

355.  Further, by depending upon the defendants' expertise and specialized knowledge, the plaintiffs have not received the 'benefit of the bargain' for which they originally contracted for, vis-a-vis procuring costs effective Workers' Compensation insurance coverage at reduced premiums, and refunds of amounts from their segregated cell.

356.   Therefore, if the plaintiffs incur a judgement and/or monetary obligations relating to the RPA contract/program, then the plaintiffs respectfully demand that this Court award indemnity by, and receive contributions from, the defendants for their failure to properly advise them, negligently suggesting and allowing the plaintiffs to enter into the RPA program, and breaching their fiduciary duties to the plaintiffs, as well as awarding legal costs, attorneys' fees, and expenses to plaintiffs for commencing this current action.

**WHEREFORE**, plaintiffs NATIONAL CONVENTION SERVICES, LLC, and EXSERVE, INC. hereby demands judgment against the defendants:

a.   As to the First Cause of Action (*Declaratory Judgment Relief - Voiding Premiums and Reforming the Contract to Conform to NYS Workers' Compensation Laws and Regulations*), the plaintiffs respectfully demand that his Court issue a declaration, pursuant to CPLR § 3001, that any and all premiums previously charged to the plaintiffs be refunded back in-full to the plaintiffs, as well as all the premiums allegedly owed by plaintiffs should be declared null and void, in addition to any 'early cancellation' penalty being demanded by the defendants should also be declared null and void; or in the alternative, that the '*Reinsurance Participation Agreement*' be reformed from its inception date, and that the rate calculations for premiums charged under the '*Reinsurance Participation Agreement*' conform to the requirements that the rates for Workers' Compensation premiums be those set by the New York Compensation Insurance Rating Board and approved by the Superintendent of the New York State Department of Financial Services, and using calculations traditionally used in the insurance industry;

b.   As to the Second Cause of Action (*Declaratory Judgment Relief - Declaring that the RPA Agreement is Not Reinsurance*), the plaintiffs respectfully demand that his Court issue a declaration, pursuant to CPLR § 3001, that the '*Reinsurance Participation Agreement*' is not a reinsurance agreement, and

therefore is indeed subject to the New York State Insurance Laws and New York State Department of Financial Services' Insurance Regulations governing insurance agreements, and more specifically Workers' Compensation insurance policies;

c.   As to the Third Cause of Action (*Declaratory Judgment Relief - Voiding the Arbitration Provisions of the RPA*), pursuant to CPLR § 3001, plaintiffs respectfully demand a declaration from this Court that the arbitration clauses within the '*Reinsurance Participation Agreement*' and '*Request to Bind Coverages and Services Agreement*' are void and unenforceable, and further, that the controversies between the parties herein shall be adjudicated by this Court;

d.   As to the Fourth Cause of Action (*Fraud - Over-Billing and Manipulation of Premiums*), the plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, proving a full refund of any monies plaintiffs previously paid into their 'segregated cell' with the defendants, refunding any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the '*Reinsurance Participation Agreement*' contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

e.   As to the Fifth Cause of Action (*Fraudulent Inducement*), the plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into their 'segregated cell' with the defendants, refunding any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the RPA contract are void *ab initio*, as well as awarding legal

costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

f.  As for the Sixth Cause of Action (*Fraudulent Concealment*), the plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding of any amounts their plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

g.  As for the Seventh Cause of Action (*Fraudulent Misrepresentation*), the plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding of any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

h.  As for the Eighth Cause of Action (*Breach of Contract*), the plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, reimbursing monies that the plaintiffs paid in Workers' Compensation benefits that CALIFORNIA INSURANCE COMPANY and CONTINENTAL INDEMNITY COMPANY were contractually obligated to pay out, refunding any amounts the plaintiffs were

overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

i.    As for the Ninth Cause of Action (*Breach of Covenant of Good faith and Fair Dealing*), plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, proving a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

j.    As for the Tenth Cause of Action (*Unjust Enrichment*), plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

k.    As for the Eleventh Cause of Action (*Declaratory Judgment Relief - Return of Monies in the Segregated Cells Related to Closed Workers' Compensation Claims*), pursuant to CPLR § 3001, plaintiffs respectfully demand that this Court provide a declaration that the plaintiffs are immediately entitled to any and all funds held in reserves in their segregated cell held by the defendants,

for any and all Workers' Compensation claims for which the claims have been settled with a permanent waiver of any future re-opening by the claimants with statutory interest thereon;

l.  As for the Twelfth Cause of Action (*Declaratory Judgment Relief - Return of Monies in the Segregated Cells with Statutory Interest*), pursuant to CPLR § 3001, plaintiffs respectfully demand that this Court provide a declaration that any monies returned to plaintiff from their segregated cell shall be returned with statutory interest;

m.  As for the Thirteenth Cause of Action (*Negligence*), plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, reimbursing any monies the plaintiffs paid in Workers' Compensation benefits out of their segregated cell for which CALIFORNIA INSURANCE COMPANY and CONTINENTAL INDEMNITY COMPANY were obligated to pay, refunding any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses for commencing this current action;

n.  As for the Fourteenth Cause of Action (*Unfair Business Practices / Violations of NY Bus. Law § 349*), plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, refunding any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action, pursuant to NY Bus. Law

§ 349(h);

o.  As for the Fifteenth Cause of Action (*Promissory Fraud*), plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cells' with the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

p.  As for the Sixteenth Cause of Action (*Action for Accounting*), the plaintiffs hereby respectfully demand that this Court direct an accounting of the premiums charged to the plaintiffs over the three-years of the '*Reinsurance Participation Agreement*' program, the amounts in the plaintiffs segregated cell which are being held by the defendants, the reserves set and are being held by the defendants for the plaintiffs' employees' Workers' Compensation claims, and all other charges the defendants have asserted against the plaintiffs over the course of the '*Reinsurance Participation Agreement*' program, to ensure such amounts are proper, just, and sufficient;

q.  As for the Seventeenth Cause of Action (*Faux Coverage Under the CIC and CNI Policies as Written*), the plaintiffs hereby respectfully demand that this Court enter judgment against the defendants for reimbursement to the plaintiffs for any and all amounts provided to the defendants for purchasing Workers' Compensation insurance policies with CALIFORNIA INSURANCE COMPANY and CONTINENTAL INDEMNITY COMPANY; in addition, the plaintiffs respectfully demand that this Court award judgement to the plaintiffs vacating any amounts due to the defendants under the '*Reinsurance Participation Agreement*' program, providing a full refund of any monies plaintiffs previously paid into the 'segregated cell' with the defendants, reimbursing any monies the plaintiffs paid in Workers' Compensation benefits

out of their segregated cell for which CALIFORNIA INSURANCE COMPANY and CONTINENTAL INDEMNITY COMPANY were obligated to pay, refunding any amounts the plaintiffs were overcharged in premiums by the defendants, awarding the plaintiffs punitive damages due to the willful and egregious conduct of the defendants directed at the plaintiffs and the public at large, declaring that the obligations under the contract are void *ab initio*, as well as awarding legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

r.    As for the Eighteenth Cause of Action (*Breach of Fiduciary Duty*), if the plaintiffs incur any type of monetary judgement and/or monetary obligation against them for entering into the '*Reinsurance Participation Agreement*' program, then the plaintiffs respectfully demand judgment against the defendants for indemnity, and to receive contributions from, the defendants for such amounts plaintiffs may be obligated to pay under the '*Reinsurance Participation Agreement*' program, as well as award legal costs, attorneys' fees, and expenses to the plaintiffs for commencing this current action;

s.    The plaintiffs demand that this Court schedule a hearing for an assessment of damages, including plaintiffs' litigation costs, expenses, disbursements and attorneys' fees incurred prosecuting this current action; and

t.    Granting to plaintiffs such other and further relief as this Court may deem just, proper and equitable under the circumstances, together with the costs and disbursements of this action.

Dated:     August 5, 2015
           Port Chester, NY

Kevin Page
O'CONNOR REDD, LLP
Attorneys for Plaintiffs
NATIONAL CONVENTION SERVICES, LLC,
and EXSERVE, INC.
PO Box 1000
242 King Street
Port Chester, NY
(914) 686-1700

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------X

NATIONAL CONVENTION SERVICES, LLC, and
EXSERVE, INC.

Plaintiffs,

    -against-

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC.;
APPLIED UNDERWRITERS, INC.;
CALIFORNIA INSURANCE COMPANY;
ARS INSURANCE AGENCY;
APPLIED RISK SERVICES, INC.;
CONTINENTAL INDEMNITY COMPANY; and
J.A. FACCIBENE & ASSOCIATES, INC.

Defendants.

**VERIFICATION**

Index No.: 652735/15£

--------------------------------------------------------------------------X

KEVIN PAGE, an attorney duly admitted to practice law in the State of New York, makes the following affirmation under the penalty of perjury:

That I am a partner with the firm of O'CONNOR REDD, LLP, the attorneys of record for plaintiffs and as such, I am fully familiar with the facts and circumstances surrounding the above action.

That I have read the foregoing SUMMONS AND VERIFIED COMPLAINT and know the contents thereof and that the same is true to my own knowledge except as to the matters therein stated to be alleged on information and belief and as to those matters, I believe them to be true.

That this verification is made by your affiant and not by plaintiff because plaintiffs, nor their principals, do not reside in the county where your affiant maintains offices.

Dated:    August 5, 2015
             Port Chester, NY

Kevin Page