UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------
NATIONAL CONVENTION SERVICES, L.L.C.
ET AL,

                    Plaintiffs,

            - v.-

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC. ET AL,

                    Defendants.
--------------------------------------

15-cv-07063 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

     This dispute arises out of a complicated insurance scheme
executed by several affiliated insurance carriers, and their
other affiliates, that was allegedly designed to circumvent the
insurance laws of, among other states, New York. It involves
three allegedly interconnected contracts that, according to the
plaintiffs, should be treated as one interdependent transaction:
First, a workers' compensation insurance contract between a
licensed insurer and an insured; second, a "reinsurance"
contract between the licensed insurer and an affiliated
"reinsurer"; and third, a "reinsurance and profit sharing"
contract between the reinsurer and the insured. The plaintiffs
allege that the "reinsurance and profit sharing" contract is not
actually a separate contract for reinsurance and profit sharing,
but instead is an illegal contract of insurance that modifies
the material terms of the workers' compensation insurance

contract issued by the licensed insurer. The plaintiffs also claim that the "reinsurance and profit sharing" contract is materially misleading, and leads insureds unwittingly to buy back the very risk that they had yielded to the licensed insurer.

The defendants' insurance scheme was so inventive and novel that it has been patented. In spite of the patent, the scheme has drawn the scrutiny of the insurance regulators of at least three states --- California, Wisconsin, and Vermont --- which have each found that the scheme did in fact violate the insurance laws of those states.

The defendants are Applied Underwriters Inc. ("Applied Underwriters"), Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA"), Applied Risk Services Inc. ("ARS"), Applied Risk Services of New York Inc. ("ARSNY"), Continental Indemnity Company ("Continental Insurance"), and California Insurance Company ("California Insurance"). The plaintiffs, on behalf of a purported class, are National Convention Services, LLC, and Exserv, Inc. (the "NCS plaintiffs"); and Madjek Construction, Inc., R.D.D., Inc., and R.D.D. Management, Inc. (the "RDD plaintiffs"). The plaintiffs have brought claims against Continental Insurance and California Insurance for breach of contract (Count III); and against all of the

defendants for rescission (Count II), violation of N.Y. Gen.
Bus. L. § 349 (Count IV), and unjust enrichment (Count V).[1]

The NCS plaintiffs brought this action in the New York
State Supreme Court, New York County. After the defendants
removed the action to this Court pursuant to 28 U.S.C. §§ 1332
and 1441, the NCS plaintiffs filed an amended class action
complaint, in which the RDD plaintiffs joined. The RDD
plaintiffs had previously filed their own action against the
defendants in the New York State Supreme Court, New York County.

The defendants have moved to dismiss the Second Amended
Complaint pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure. For the following reasons, the defendants'
motion to dismiss is **granted in part** and **denied in part**.

### I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiff's favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.

---

[1] The plaintiffs initially brought a claim for declaratory
judgment (Count I) against the defendants seeking to have an
arbitration clause in the reinsurance and profit sharing
contracts declared unenforceable. At oral argument, the
defendants stated that they will not seek to enforce the
arbitration clause against the plaintiffs in this litigation.
There is therefore no possibility that the arbitration clause
will be invoked between the parties in this case. The claim for
declaratory judgment is accordingly **dismissed** without prejudice
as moot.

2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.; see also Springer v. U.S. Bank Nat'l Ass'n, No. 15-cv-1107 (JGK), 2015 WL 9462083, at *1 (S.D.N.Y. Dec. 23, 2015). When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice

may be taken. <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002); <u>see also</u> <u>Springer</u>, 2015 WL 9462083, at *1.

## II.

The allegations in the Second Amended Complaint are accepted as true for the purposes of this motion to dismiss.

## A.

Workers' compensation is a form of insurance that provides wage replacement and medical benefits to employees injured during the course of their employment. SAC ¶ 30. New York has enacted a comprehensive regulatory scheme for workers' compensation that shifts the risk of on-the-job injuries from employees to employers. SAC ¶ 30. In turn, under the New York scheme, employers may purchase workers' compensation insurance from insurance carriers that are licensed to market and sell insurance in New York. SAC ¶ 35.

Pursuant to the Workers' Compensation Law ("WCL") §§ 10 and 50, all employers must secure the payment of workers' compensation benefits for their employees. SAC ¶ 30. The WCL provides that employers may secure the payment of workers' compensation for their employees by purchasing a workers' compensation policy from any insurance carrier authorized to transact such business in New York. SAC ¶ 31 (citing WCL § 50(2)). An insurance carrier must be licensed by the New York

Department of Financial Services (the "DFS") in order to issue workers' compensation insurance in New York.[2] SAC ¶¶ 9, 35.

The New York Insurance Law ("NYIL") regulates the provision of workers' compensation insurance. SAC ¶ 3. For example, under the NYIL, all workers' compensation insurance policy forms, rates, rating plans, rating rules, and rate manuals must be filed with and approved by the DFS. SAC ¶ 2. An insurance carrier may not vary an already approved rate or policy form without prior approval from the DFS. SAC ¶¶ 3-4, 33-34.

Insurance carriers offer two main types of workers' compensation policies: guaranteed cost ("GC") policies, and retrospective rating plan ("RRP") policies. A GC policy essentially fixes insurance premiums at the outset, meaning that the actual cost of the claims against the policy will not cause premiums to fluctuate during the life of the policy. SAC ¶¶ 35-38, 40-41. Premiums under a GC policy may fluctuate depending upon certain other factors, such as the size of an employer's workforce, and the injury risks associated with a particular field of business, but generally give an employer a degree of certainty as to the cost of the insurance policy. SAC ¶¶ 36-38. By contrast, a RRP policy is loss sensitive, meaning that

---

[2] The DFS is the successor to the former New York Department of Insurance as the agency responsible for regulating and supervising insurance in New York. For the purposes of this opinion, the "DFS" will refer to both the DFS and the now defunct New York Department of Insurance.

premiums can fluctuate during the life of the policy depending on the actual cost of the claims (typically, the greater the actual cost of the claims, the greater the premiums owed). SAC ¶¶ 35, 39-40. As compared to large employers, small-to-medium size employers are alleged to prefer GC policies because such employers require accurate estimates of future costs and are materially harmed by increases in costs. See SAC ¶ 94.

**B.**

The defendants are alleged to be members of the Berkshire Hathaway Group, and are also alleged to be affiliated with each other. SAC ¶ 22; see also SAC, Ex. D (In re: Shasta Linen Supply Inc.) at 9-10 (discussing the complicated organizational structure of the defendants).

Continental Insurance is an Iowa insurance company, with its headquarters and principal place of business in Nebraska. SAC ¶ 20. California Insurance is a California insurance company, with its principal place of business in Nebraska. SAC ¶ 21. During the relevant period, the Second Amended Complaint alleges that both Continental Insurance and California Insurance were doing business in New York as licensed insurance carriers issuing insurance policies, including policies for workers' compensation insurance. SAC ¶¶ 20-21.

Continental Insurance and California Insurance are wholly-owned subsidiaries of North American Casualty Company, which is

not named as a party in this action. SAC, Ex. D at 9-10. North
American Casualty Company is a wholly owned subsidiary of
Applied Underwriters, a Nebraska financial service corporation,
with its principal place of business in Nebraska. SAC, Ex. D at
10. Applied Underwriters provides payroll processing services,
and solicits and underwrites the sale of workers' compensation
insurance to small-to-medium size employers through its
affiliated insurance companies. SAC ¶ 16.

Applied Underwriters is also the parent company of AUCRA
and ARS. SAC, Ex. D at 9-10. AUCRA is an insurance company that,
during the relevant period, was domiciled in the British Virgin
Islands. SAC ¶ 17. AUCRA was not a licensed insurer in New York.
SAC ¶ 9. AUCRA is currently organized under the laws of Iowa,
with its principal place of business in Nebraska. SAC ¶ 17. ARS
is a Nebraska corporation, with its principal place of business
in Nebraska. SAC, Ex. D at 11; see also SAC ¶ 18. ARSNY is a New
York corporation that does business in New York. SAC ¶ 19, 22.

The plaintiffs allege that the defendants are under common
ownership and control, that they share common officers and
directors, and that they use the same office space. SAC ¶ 22;
see also SAC, Ex. D at 11 (finding of the California Insurance
Commissioner that "[t]he Boards of Directors for [California
Insurance], [Applied Underwriters], and AUCRA are identical in
composition").

C.

The plaintiffs claim that the defendants used their corporate structure to thwart the NYIL, and, in the process, willfully violated many of its sections. See, e.g., SAC ¶ 42. Each defendant allegedly played a role in effecting the scheme.

As the first step in the alleged scheme, Continental Insurance and California Insurance marketed and sold workers' compensation GC policies that had been filed with, and approved by, the DFS (the "Approved GC policies").[3] SAC ¶¶ 8-9; see also SAC, Ex. B (Workers' Compensation and Employer's Liability Insurance Policy Issued by Continental Insurance to the RDD Plaintiffs). The plaintiffs allege that the Approved GC policies, as stand-alone policies, gave the appearance of compliance with the NYIL. SAC ¶¶ 8-9. The Approved GC Policies contained fixed-cost premiums rates, see SAC ¶ 13, and were effective for one-year periods, an allegedly standard term in a GC workers' compensation policy, SAC ¶¶ 10, 60. The Approved GC Policies provided that:

> This policy includes at its effective date the
> Information Page and all endorsements and schedules
> listed there. It is a contract of insurance between
> you (the employer named in Item 1 of the Information

---

[3] The plaintiffs allege that the Approved GC Policies issued by Continental Insurance to New York employers were in connection with the New York operations of those employers, while the Approved GC Policies issued by California Insurance to New York employers were in connection with the operations of those employers outside of New York. SAC ¶ 46 n.7.

Page) and us (the insurer named on the Information Page). *The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.* SAC ¶ 47 (emphasis added).

The plaintiffs allege that the Approved GC Policies were a sham designed to conceal from the DFS the real terms of unapproved insurance policies that the defendants were marketing and selling, which were set forth in a separate document. SAC ¶¶ 42, 44. The plaintiffs allege that purchase of the Approved GC Policies offered by Continental Insurance and California Insurance was conditioned on an insured's entrance into a "Profit Sharing Plan." SAC ¶¶ 9, 48. The Profit Sharing Plans were known by a variety of names, including "SolutionOne" and "EquityComp." SAC ¶ 48.

As part of the Profit Sharing Plan, the insured had to agree to a "Reinsurance Participation Agreement" (the "RPA") issued by AUCRA (not Continental Insurance or California Insurance) that allegedly modified the material terms of the Approved GC Policy. SAC ¶ 9; see also Ex. C (The RPA Issued by AUCRA to the NCS plaintiffs). The RPA stated that AUCRA had entered into a "Reinsurance Treaty . . . with California Insurance . . . and, through its pooling arrangement with other affiliates of Applied Underwriters, Inc., [i]ncluding, but not limited to Continental [Insurance]," and that the RPA's purpose

was to allow the insured party to "share [i]n the underwriting results of the Workers' Compensation policies of Insurance Issued for the benefit of the [Insured] by the Issuing Insurers." SAC, Ex. C at 1.

The RPA was not filed with, or approved by, the DFS; indeed, the plaintiffs claim that the DFS could not have approved the RPA (or an Approved GC Policy as modified by the RPA) because the RPA, on its face, violated numerous sections of the NYIL, and the regulations promulgated thereunder. SAC ¶¶ 5-8, 60-62. The plaintiffs claim that the RPA was not an endorsement to the Approved GC Policy, SAC ¶ 49, nor could it be an instrument of reinsurance because an instrument of reinsurance is by definition unconnected to the original insured, SAC ¶ 75.

The plaintiffs allege that the RPA superseded the fixed-cost premium rates in the Approved GC Policies with loss sensitive rates. SAC ¶ 43. The plaintiffs also allege that the RPA changed the effective period of an Approved GC Policy from one year to three years, and that the RPA imposed additional failure-to-renew costs that incentivized insureds to renew the RPA beyond the three-year period. SAC ¶¶ 60-61. The plaintiffs allege that the RPA imposed onerous early cancellation penalties. SAC ¶ 62. The plaintiffs allege that cancellation of

the RPA would result in cancelation of the Approved GC Policy. SAC ¶ 11.

The California Insurance Commissioner has reviewed an allegedly substantially identical insurance package issued by the defendants to a California-insured where the insured signed an approved (under California law) GC workers' compensation insurance policy issued by California Insurance, and an RPA issued by AUCRA. See SAC, Ex. D; see also SAC ¶¶ 5, 97. After an adversarial hearing during which California Insurance had the opportunity to present evidence, including witness testimony, the California Insurance Commissioner found that "where the RPA and the guaranteed cost policy differ, the RPA terms supplant those of the guaranteed-cost policy." SAC, Ex. D at 55.

The plaintiffs allege that, in marketing the Profit Sharing Plan to employers, the defendants mischaracterized the RPA as a "reinsurance" and a "profit sharing" instrument --- when it was in reality an insurance contract that modified the terms of the Approved GC Policy --- to escape regulatory scrutiny, and to mislead customers. SAC ¶¶ 5-6, 51-52, 55. The plaintiffs claim that the RPA obligates an insured to fund a "cell," with the amount of funding dependent on a complex formula that takes into account "loss experience" (in other words, the cost of the insured's claims filed against the Approved GC Policy). SAC ¶¶ 56-57. The plaintiffs allege that, although the defendants

12

represented at the outset that they will return "excess premium and fees" at the conclusion of the Profit Sharing Plan, the Plan contains numerous caveats and delaying provisions, and no insured has received a distribution or return of premiums. See SAC ¶ 63-64; see also SAC, Ex. D at 35 (finding of the California Insurance Commissioner that, as of June 20, 2016, "AUCRA has not made any profit sharing distributions" to any insured party).

The plaintiffs allege that, to explain the transaction to customers, the defendants provided customers with the Approved GC Policy along with marketing materials (consisting of a "Program Summary & Scenario," a "Program Proposal," and a "Request to Bind Coverages and Services") describing the RPA, but not the RPA itself. SAC ¶¶ 81, 83; see also SAC, Ex. E (Request to Bind Coverages and Services provided to the RDD plaintiffs); SAC, Ex. F (Workers' Compensation Program Summary & Scenario provided to the RDD plaintiffs); SAC, Ex. G (Workers' Compensation Program Proposal & Rate Quotation provided to the RDD plaintiffs). As such, a customer of an Approved GC Policy could not review the final terms of the RPA (to which the customer had to agree in order to receive coverage under an Approved GC Policy) until after the customer had agreed in advance to enter into the Profit Sharing Plan by signing the Request to Bind Coverages and Services. SAC ¶¶ 53, 71, 81; see

also SAC, Ex. E. The Program Proposal states that the "Profit Sharing Plan is a reinsurance transaction separate from the guaranteed cost policies," and that the "Profit Sharing Plan is not a filed retrospective rating plan or dividend plan." See SAC, Ex. G at 3. The plaintiffs claim that this statement was false and misleading because the RPA in reality altered the terms of the Approved GC Policy, which a customer would not understand based upon reviewing the marketing materials, or even the RPA itself. See SAC ¶¶ 50-51, 65, 79-80, 86; see also SAC, Ex. D at 28-29 (finding of the California Insurance Commissioner that an insured that signed a GC policy issued by California Insurance, and a Request to Bind Coverages and Services issued by Applied Underwriters, but later refused to sign an RPA issued by AUCRA, would lose insurance coverage under the GC policy).

The plaintiffs allege that, even though the marketing materials disclosed cost estimates for the Profit Sharing Plan, a customer could not accurately determine the likely costs associated with the Profit Sharing Plan based upon those estimates. SAC ¶¶ 87-88. On this point, the California Insurance Commissioner found that:

> [Applied Underwriters'] Sales department distributes a Program Summary & Scenario to brokers and their clients. The Scenarios demonstrate the minimum and maximum three-year program costs and estimate the final program costs based on ultimate claims costs. The Scenarios chart the single-year prorated amounts a participant could expect to pay. . . . But this chart

is misleading. EquityComp is sold as a three-year program and not three one-year programs. Accordingly, the single-year table does not represent the one-year cost of the program. In fact, it is the employer's three-year loss history that ultimately guides the cost of the program. SAC, Ex. D. at 27.

The plaintiffs allege that the defendants' scheme broadly and aggressively targeted small-to-medium size businesses because such businesses are less sophisticated than larger companies, and would be susceptible to agreeing to an Approved GC Policy, coupled with the RPA, without appreciating the ramifications of the decision. SAC ¶¶ 65, 77, 82; see also SAC, Ex. D at 22-23. Indeed, the Plan Proposal states that "Applied Underwriters and its affiliates" established Profit Sharing Plan cells that are "designed specifically for our small and mid-sized insureds." SAC, Ex. G at 5. The plaintiffs allege that the defendants marketed the Profit Sharing Plan nationally with standardized documents on a take-it-or-leave-it basis. SAC ¶¶ 81-83.

The plaintiffs allege that the defendants operated the Profit Sharing Plan as a single business unit without regard to their corporate form, and that the distinction between the Approved GC Policy and the RPA as distinct contracts issued by distinct entities is a fiction. SAC ¶ 22. Applied Underwriters allegedly sent notices of cancellation to holders of Approved GC Policies issued by Continental Insurance, or California

15

Insurance, when the holder violated the terms of the RPA issued
by AUCRA, even when the holder had not violated the terms of the
Approved GC Policy. SAC ¶ 23. ARS prepared the Program Summary &
Scenario and the Program Proposal on behalf of Applied
Underwriters. See SAC, Exs. F-G. ARSNY allegedly served as the
billing agent on behalf of AUCRA, Continental Insurance, and
California Insurance. SAC ¶ 22. The Program Proposal provided
that Applied Underwriters used an "integrated billing system" to
assess charges under the Approved GC Policy and the RPA ---
accordingly, payments due on the Approved GC Policy and the RPA
appeared in a single line item. SAC, Ex. G at 5; see also SAC,
Ex. D at 30.

Applied Underwriters has patented the scheme at issue. See
SAC, Ex. A ("Reinsurance Participation Plan", Patent No.
7,908,157 B1). The patent explains that:

> One of the challenges of introducing a fundamentally
> new premium structure into the marketplace is that the
> structure must be approved by the respective insurance
> departments regulating the sale of insurance in the
> states in which the insureds operate. In the United
> States, each state has its own insurance department
> and each insurance department must give its approval
> to sell insurance with a given premium plan in its
> respective jurisdiction. Getting approval can be
> extremely time consuming and expensive, particularly
> with novel approaches that a department hasn't had
> experience with before. Also, many states require
> insurance companies to only offer small sized and
> medium sized companies a Guaranteed Cost plan, without
> the option of a retrospective plan. In part, this is
> because of governmental rules and laws that regulate
> the insurance industry. Disclosed herein is a

16

reinsurance based approach to providing non-linear retrospective premium plans to insureds that may not have the option of such a plan directly. SAC, Ex. A at 6.

The state insurance departments of California, Vermont, and Wisconsin have concluded that the defendants' marketing and sale of a guaranteed cost plan compliant with the laws of those respective states, coupled with the RPA, does not comply with the insurance laws of those respective states. See SAC, Ex. D at 53-63 (determination by the California Insurance Commissioner that the RPA is a collateral agreement that modifies the underlying guaranteed cost policy in violation of California law); SAC, Ex. I (Vermont Stipulation and Consent Order) at 5-11 (ordering Continental Insurance, Applied Underwriters, ARS, and AUCRA to cease marketing and selling the RPA, and to pay restitution to policyholders that entered into Profit Sharing Plans); SAC, Ex. J (Wisconsin Office of the Commissioner of Insurance Orders) (ordering ARS and Continental Insurance to cease-and-desist marketing and selling the Profit Sharing Plans); see also SAC, Ex. H (California Insurance Commissioner Notice of Hearing for Cease & Desist Orders).

### D.

The NCS plaintiffs are New York corporations, with their principal places of business in New York, that provide services in connection with exposition and trade shows throughout the

17

United States. SAC ¶ 14. The RDD plaintiffs are also New York corporations, with their principal places of business in New York. SAC ¶ 15.

Around October 2012, the NCS plaintiffs began requesting quotes from workers' compensation insurance carriers. SAC ¶ 101. The defendants proposed that the NCS plaintiffs enter into a Profit Sharing Plan, and provided the plaintiffs with Approved GC Policies issued by Continental Insurance, and California Insurance, along with marketing materials describing the Profit Sharing Plan. SAC ¶ 101-02; see also Coles Decl., Ex. 1 (Workers' Compensation Program Proposal & Rate Quotation provided to the NCS plaintiffs); Coles Decl., Ex. 3 (Workers' Compensation Program Summary & Scenario provided to the NCS plaintiffs). The NCS plaintiffs agreed to a Request to Bind Coverages and Services that bound them to accept the terms of the Profit Sharing Plan, and were allegedly only then provided with the actual RPA. SAC ¶ 102; see also SAC, Ex. B. The plaintiffs allege that their premiums under the Profit Sharing Plan far exceeded the premiums set forth in the Approved GC Plan. SAC ¶¶ 105-10. For example, while the annual estimated cost of coverage under the Approved GC Policy for the 2014-2015 term was $420,325, the premiums for January 2015 alone were $683,268. SAC ¶ 109. The NCS plaintiffs refused to pay their January 2015 premiums, and the defendants canceled their

insurance coverage on March 22, 2015. SAC ¶¶ 111-12. The defendants have since demanded that the NCS plaintiffs pay $1.59 million in outstanding premiums, plus a cancellation fee of nearly $1 million. SAC ¶ 112.

The RDD plaintiffs' experience with the defendants is alleged to be substantially similar to that of the NCS plaintiffs. In November 2009, the RDD plaintiffs' insurance broker obtained quotations for workers' compensation insurance, and presented the RDD plaintiffs with the defendants' marketing materials describing the Profit Sharing Plan. SAC ¶ 115; see also SAC, Exs. E-G. The RDD plaintiffs agreed to participate in the Profit Sharing Plan on December 31, 2009. SAC ¶ 116; see also Coles Decl., Ex. 2 (The RPA Issued by AUCRA to the RDD plaintiffs). In April 2012, the defendants began charging the RDD plaintiffs substantially higher premiums, as compared to prior months. SAC ¶¶ 120-21. In early July 2012, the RDD plaintiffs notified Applied Underwriters that it had purchased insurance from another insurance carrier effective July 1, 2012. SAC ¶ 122. On July 18, 2012, Continental Insurance canceled the Approved GC Policy issued to the plaintiffs even though the RDD plaintiffs had allegedly paid the premiums due on that Approved GC Policy.[4] SAC ¶ 122. As a consequence, the RDD plaintiffs

---

[4] The defendants do not argue that Continental Insurance had a valid reason for canceling the policy.

allege that they may have no workers' compensation coverage with respect to any employee claims that arise from events that took place between December 31, 2011, and August 2, 2012. SAC ¶ 123.

On December 27, 2013, Applied Underwriters demanded that the RDD plaintiffs pay an additional $95,368.54 incurred after the cancellation of the Profit Sharing Plan. SAC ¶ 124. The RDD plaintiffs allege that the defendants have not provided an explanation for the additional charge. SAC ¶ 126.

### III.

The parties agree that the Approved GC Policies, as contracts of insurance, must be governed by New York law. <u>See</u> NYIL § 3103(b). The RPAs provide that they are governed by Nebraska law. SAC, Ex. C ¶ 16. However, the parties agree that New York law should apply to all of the issues in this dispute, and New York law will be applied in accordance with their agreement.[5] <u>Am. Fuel Corp. v. Utah Energy Dev. Co.</u>, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."); <u>see also</u> <u>Rolon v. U.S. Amada, Ltd.</u>, No. 95 Civ. 6231 (LAP), 1997 WL 724798, at *2 (S.D.N.Y. Nov. 18, 1997). In any event, the parties agree that, for the common law claims, there is no conflict between Nebraska and New York law, and that

---

[5] Specifically, the parties agreed that New York law should be applied in response to this Court's request for supplemental briefing on the law applicable to this case.

the N.Y. Gen. Bus. L. § 349 claims must be governed by New York law. See 433 Main St. Realty, LLC v. Darwin Nat'l Assurance Co., No. 14-CV-587 (NGG), 2014 WL 1622103, at *2 n.2 (E.D.N.Y. Apr. 22, 2014).

This case implicates questions related to the proper interpretation of New York statutes and New York common law. A federal court sitting in diversity must look to the decisional law of the forum state and the state constitution and statues. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Travelers Ins. Co. v. 633 Third Assoc., 14 F.3d 114, 119 (2d Cir. 1994). Where the substantive law of the forum is ambiguous or uncertain, the federal court must strive to predict how the highest court of the forum state would resolve the issue. Travelers, 14 F.3d at 119; In re Eastern and Southern Districts Asbestos Litig., 772 F. Supp. 1380, 1388-91 (E. & S.D.N.Y. 1991) (Weinstein, J.), rev'd on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831 (2d Cir. 1992). Decisions of the Appellate Division "are entitled to persuasive, if not decisive consideration." Sphere Drake Ins. Co. v. P.B.L. Entertainment, Inc., 30 F.3d 21, 23 (2d Cir. 1994), vacated on other grounds, 52 F.3d 22 (2d Cir. 1995) (citation omitted); see also Chase Manhattan Bank, N.A. v. T & N plc, 905 F. Supp. 107, 113-14 (S.D.N.Y. 1995).

**A.**

In Count II, the plaintiffs have brought claims against the defendants for rescission to reform the transactions at issue by voiding the terms of the RPAs such that the plaintiffs are only bound by the Approved GC Policies, and for rescissory damages in the amount of any premiums charged and paid over-and-above the premiums called for by the Approved GC Policies.

The plaintiffs argue that the RPAs are void as a matter of public policy.[6] The defendants do not contest the alleged violations of the NYIL; rather, they argue that there is no private right of action to enforce the sections of the NYIL relating to workers' compensation insurance.

The plaintiffs concede that the NYIL does not confer a general private right of action to enforce compliance with all of its sections, but they do contend that some sections expressly or impliedly provide for a private right of action as an enforcement mechanism. See, e.g., Harrison v. Metro. Life Ins. Co., 417 F. Supp. 2d 424, 432 (S.D.N.Y. 2006); Soliman v. Daimler AG, No. CV 10-408 (SJF) (AKT), 2011 WL 765885, at *9 (E.D.N.Y. Feb. 9, 2011) (collecting cases), report and recommendation adopted, No. 10 CV 408 (SJF) (AKT), 2011 WL

---

[6] The plaintiffs allege that the defendants violated NYIL § 3426, SAC ¶ 62, but that section does not apply to workers' compensation insurance. See NYIL § 3426(l)(2). Accordingly, any claims based on the violation of that section are **dismissed.**

765931 (E.D.N.Y. Feb. 24, 2011); see also Cruz v. TD Bank, N.A.,
2 N.E.3d 221, 226-27 (N.Y. 2013).

The defendants rely extensively on the decisions of the
Court of Appeals for the Second Circuit and the New York Court
of Appeals in the Schlessinger litigation. In Schlessinger v.
Valspar Corp., 686 F.3d 81, 83, 85 (2d Cir. 2012) (Schlessinger
I), the Court of Appeals for the Second Circuit considered
whether private plaintiffs should be allowed to sue for
rescission to excise a "store closure provision" from a contract
because the provision allegedly violated N.Y. Gen. Bus. L.
§ 395-a, even though that provision vested the New York Attorney
General with exclusive enforcement authority. The Court of
Appeals observed that, "This issue lies at the intersection of
two legal doctrines that lead to conflicting results: the
doctrine that courts will not enforce illegal contracts and the
doctrine that courts should follow clearly expressed legislative
intent." Id. at 85.

Under the doctrine related to illegal contracts,

As a general rule, New York courts will not enforce
illegal contracts. The general rule is modified,
however, where the illegality concerns the violation
of a regulatory statute:

"[T]he violation of a statute that is merely malum
prohibitum will not necessarily render a contract
illegal and unenforceable. If the statute does not
provide expressly that its violation will deprive the
parties of their right to sue on the contract, and the
denial of relief is wholly out of proportion to the

23

requirements of public policy the right to recover will not be denied."

Under [the] rule [discussed in Benjamin v. Koeppel, 650 N.E.2d 829, 830 (N.Y. 1995)], a court may enforce an illegal contract if three requirements are satisfied: (1) the statutory violation is malum prohibitum; (2) the statute that renders the contract illegal does not specifically require that all contrary contracts be rendered null and void; and (3) the penalty imposed by voiding the contract is "wholly out of proportion to the requirements of public policy." Schlessinger, F.3d 686 at 85 (citations omitted).

The Court of Appeals noted that this doctrine had generally been applied to licensing cases in which the contract at issue would have been "perfectly legal" had the regulated party simply been licensed; in other words, where the violation of the statutory scheme was purely procedural. Id. at 85-86. By contrast, the plaintiffs in Schlessinger I were not seeking to avoid the entire contract, but instead to reform the contract by excising a particular provision that, the plaintiffs claimed, violated the substantive requirements imposed by state law. Id. at 86.

The Court of Appeals reasoned that permitting this sort of remedy was in tension with the doctrine on the "implied right of action." Id. at 87. According to the Court of Appeals, "If this issue were to be analyzed as one of implied right of action, the proper conclusion could be that the legislature did not evince

the requisite intent to void provisions that were contrary to
§ 395-a." Id.

The Court of Appeals accordingly certified the following
question to the New York Court of Appeals: "May parties seek to
have contractual provisions that run contrary to General
Business Law § 395-a declared void as against public policy?"
Id. at 89.

The New York Court of Appeals in Schlessinger v. Valspar
Corp., 991 N.E.2d 190, 192 (N.Y. 2013) (Schlessinger II),
answered the question in the negative. Schlessinger II analyzed
the case in terms of whether N.Y. Gen. Bus. L. § 395-a conferred
an express or implied right of action on private plaintiffs,
reasoning that "the legislature chose to assign enforcement
exclusively to government officials" and that "the legislature
did not include in section 395-a specific language invalidating
inconsistent contract provisions, as it did elsewhere in the
General Business Law." Id. Schlessinger II concluded that
permitting a private of action for rescission would "subvert the
legislature's choice to leave such enforcement mechanisms out of
General Business Law § 395-a." Id. at 192.

In reaching its conclusion, the Court of Appeals relied
upon Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship, 906
N.E.2d 1049, 1054 (N.Y. 2009):

In our view, this case is much like Kerusa, which
involved a common-law tort claim. In Kerusa, we held
that the purchaser of a condominium could not sue the
building's sponsor for common-law fraud where the
purported fraud was predicated solely on alleged
material omissions from the offering plan amendments
mandated by the Martin Act (General Business Law art.
23-A) and the Attorney General's implementing
regulations. As in this case, then, the purported
claim would not have existed absent provisions in a
statute-in Kerusa, the Martin Act; here, General
Business Law § 395-a. We concluded that "to accept
Kerusa's pleading as valid would invite a backdoor
private cause of action to enforce the Martin Act in
contradiction to our holding . . . that no private
right to enforce that statute exists." Schlessinger,
991 N.E.2d at 192-93 (citations omitted); see also
Schlessinger v. Valspar Corp., 723 F.3d 396, 398 (2d
Cir. 2013) (Schlessinger III).

The plaintiffs argue that the doctrine on illegal contracts

should apply to this case and that the reasoning in Schlessinger

II should be limited to the N.Y. Gen. Bus. L. § 395-a context.

However, Schlessinger II's reasoning and its reliance on Kerusa

--- which dealt with the Martin Act --- indicate that

Schlessinger II's lessons foreclose claims that would otherwise

circumvent the enforcement remedies contemplated by a statutory

scheme like the NYIL. See Agerbrink v. Model Serv. LLC, No. 14-

CV-7841 (JPO), 2015 WL 3750674, at *3 (S.D.N.Y. June 16, 2015)

("While Plaintiff insists that she may seek a declaratory

judgment even though the relevant statutes [N.Y. Gen. Bus. art.

11] do not provide a private right of action, the New York Court

of Appeals has rejected this precise argument."); Sigall v.

Zipcar, Inc., No. 13 CIV. 4552 (JPO), 2014 WL 700331, at *3-4

(S.D.N.Y. Feb. 24, 2014), aff'd, 582 F. App'x 18 (2d Cir. 2014)
(summary order); see also Treiber v. Aspen Dental Mgmt., Inc.,
635 F. App'x 1, 3 (2d Cir. 2016) (summary order) ("Insofar as
the crux of plaintiffs' complaint is defendants' proscribed
corporate practice of medicine, New York law leaves enforcement
to the Attorney General, affording no enforcement rights to
consumers." (citing Schlessinger, 991 N.E.2d at 193)).

The claims for rescission as a matter of public policy are
based on alleged violations of the NYIL. But a rescission remedy
based exclusively on public policy would be inconsistent with
the framework expressly provided for by the NYIL. The NYIL
enforcement regime is comprehensive. As a general matter, the
NYIL "establishes the procedures for enforcement of [its]
various provisions . . . by the Superintendent of Insurance."
Harrison, 417 F. Supp. 2d at 432 (citation omitted); see also,
e.g., Gonzales v. Nat'l Union Fire Ins. of Pittsburgh, Pa., No.
15 CIV. 2259 (PGG), 2016 WL 5107033, at *11 (S.D.N.Y. Sept. 19,
2016); Quanta Specialty Lines Ins. Co. v. Inv'rs Capital Corp.,
No. 06 CIV. 4624 (PKL), 2008 WL 1910503, at *6 & nn.3, 5
(S.D.N.Y. Apr. 30, 2008); 3405 Putnam Realty Corp. v. Chubb
Custom Ins. Co., 788 N.Y.S.2d 64, 66 (App. Div. 2005). Certain
sections of the NYIL provide for additional section-specific
penalties for their violation, while others expressly confer a

private right of action on aggrieved parties. See, e.g., NYIL §
4226.

Moreover, NYIL § 3103 already provides a statutory
mechanism for voiding contractual provisions that are
inconsistent with the NYIL. NYIL § 3103 provides that:

> Except as otherwise specifically provided in this
> chapter, any policy of insurance or contract of
> annuity delivered or issued for delivery in this state
> in violation of any of the provisions of this chapter
> shall be valid and binding upon the insurer issuing
> the same, but in all respects in which its provisions
> are in violation of the requirements or prohibitions
> of this chapter it shall be enforceable as if it
> conformed with such requirements or prohibitions.

See also T.P.K. Constr. Corp. v. S. Am. Ins. Co., 752 F.
Supp. 105, 111 n.8 (S.D.N.Y. 1990) ("If plaintiff's argument is
based on the broadness of the hold harmless and non-guarantee
provisions of the Agreement as being unconscionable, under New
York law those provisions do not void the Agreement but are
enforceable against the insurer under § 3103(a) of the New York
Insurance Law."). Therefore, the viability of the plaintiffs'
claims for rescission depends on whether the plaintiffs have a
private right of action to enforce any relevant sections of the
NYIL.[7] See Schlessinger, 991 N.E.2d at 192.

---

[7] The plaintiffs rely heavily on Dornberger v. Metro. Life Ins.
Co., 961 F. Supp. 506, 532, 535-36 (S.D.N.Y. 1997), to argue
that they may rescind the RPAs on public policy grounds, but
that case only found that rescission of an insurance contract
was justified based upon violations of the laws of Switzerland,
and not (as the plaintiffs assert) violations of the NYIL. In

The plaintiffs do not contend that any of the allegedly violated provisions confer an express private right of action.

"In the absence of an express private right of action, plaintiffs can seek civil relief in a plenary action based on a violation of the statute 'only if a legislative intent to create such a right of action is fairly implied in the statutory provisions and their legislative history.'" Cruz, 2 N.E.3d at 226 (citation omitted). "This determination is predicated on three factors," of which the third is the most important: "'(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme.'" Id. (quoting Sheehy v. Big Flats Cmty. Day, Inc., 541 N.E.2d 18, 20 (N.Y. 1989)). Because the NYIL contemplates administrative enforcement of the statute, "The question then becomes whether, in addition to administrative enforcement, an implied private right of action would be consistent with the legislative scheme." Uhr ex rel. Uhr v. E. Greenbush Cent. Sch. Dist., 720 N.E.2d 886, 890 (N.Y. 1999).

---

any event, Dornberger preceded Schlessinger II, which makes clear that the issue must be evaluated under the right of action rubric. See also Gonzales, 2016 WL 5107033, at *9 n.8 (noting that Dornberger is in tension with other cases that have analyzed claims for rescission of insurance contracts).

The defendants argue that no section of the NYIL confers an implied right of action because the Superintendent of Insurance can enforce any violation of any section of the NYIL, but that is not an accurate statement of the law. The court in Maimonides Med. Ctr. v. First United Am. Life Ins. Co., 981 N.Y.S.2d 739, 743 (App. Div. 2014), recently rejected this precise argument in concluding that NYIL § 3224-a, the "Prompt Pay Law," confers an implied right of action. See also Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co., No. 14 CIV. 2495 (ER), 2016 WL 4382709, at *13 (S.D.N.Y. Aug. 16, 2016).

The court in Maimonides concluded that an implied right of action was consistent with the NYIL's administrative enforcement scheme. The court focused on the mandatory "shall" language of NYIL § 3224-a(a), reasoning that --- unlike NYIL sections that did not confer a private right of action --- "the determination of a violation and the calculation of resulting damages do not require any special agency expertise" because "[t]he Prompt Pay Law provides an easily determinable standard for violations." Maimonides Med. Ctr., 981 N.Y.S.2d at 743, 748.

Moreover, the court noted that NYIL § 3224-a was not simply "remedial in nature," but imposed "an affirmative duty upon insurers to timely pay or dispute claims. In the event of a violation, health care providers and patients are given the right to full payment of the claim plus interest, and insurers

are obligated to make such payment." Id. at 746. The court
contrasted NYIL § 2601, which "provides that no insurer shall
engage in unfair settlement practices" and thus "concerns
business general practices, and is enforceable only by the
Superintendent," with NYIL § 3224-a, which is not "primarily
designed to provide a mechanism for preventing harm to the
public in general." Id. at 746-48. Rather, the ability to pursue
statutory damages for a violation of NYIL § 3224-a was limited
to a subset of insureds (patients and health care providers) in
contractual privity with the insurers, "regardless of whether a
breach of contract cause of action would be otherwise
successful." Id. at 746.

                                (i)

     The plaintiffs have not attempted to explain how the
individual sections of the NYIL listed in the Second Amended
Complaint provide for a private right of action. Indeed, the
vast majority of the sections allegedly violated cannot
reasonably provide an implied right of action. Most of the
alleged violations relate to licensing requirements and other
discretionary determinations over matters entrusted to the
Superintendent of Insurance. See, e.g., NYIL §§ 1102, 1204,
2117, 2305, 2307, 7003. The recognition of a private right of
action to enforce compliance with these sections would neither
promote the legislative purpose nor be consistent with the

                                31

legislative scheme of the NYIL. These sections are entirely
remedial in nature, and serve to prevent harm to the public in
general. As courts consistently recognize, the NYIL's licensing
scheme reflects the legislature's judgment that New York's
administrative apparatus, and not courts, should be charged with
making licensing determinations, and meting out punishments for
licensing violations. See First Mercury Ins. Co. v. 613 N.Y.
Inc., 609 F. App'x 664, 668 (2d Cir. 2015) (summary order)
("[T]he weight of authority in New York holds that an insurance
company's failure to comply with the licensing scheme of this
State does not invalidate the insurance contract, but rather
subjects the insurer to the available statutory penalties and
sanctions that may be imposed by the Superintendent of
Insurance." (quoting 3405 Putnam Realty Corp., 788 N.Y.S.2d at
67) (no private right of action under NYIL § 1102)); Quanta
Specialty Lines, 2008 WL 1910503, at *4-5 & nn.3, 5 (holding
that "to allow [the plaintiff] a private cause of action would
be incompatible with the clearly defined procedural mechanism
provided by the legislature" and rejecting claim for rescission
on the theory that the policies were "unlawful group insurance
policies"); Clayton's Auto Glass, Inc. v. First Data Corp., No.
12-CV-5018 (JS), 2013 WL 5460872, at *4 (E.D.N.Y. Sept. 30,
2013) ("[P]laintiffs' claim fails because there is no private
right of action for alleged violations of New York Insurance

Law's licensing requirements."); <u>Polly Esther's S., Inc. v.</u>
<u>Setnor Byer Bogdanoff</u>, 807 N.Y.S.2d 799, 812 (Sup. Ct. 2005) (no
private right of action under NYIL § 2117); N.Y. General Counsel
Opinion 7-7-2005 (#2), 2005 WL 3980860 ("An authorized insurer's
use of an unapproved policy form, where the Insurance Law
requires the Superintendent's prior approval of the policy form,
does not invalidate the policy.").

Similarly, NYIL § 2324 --- which broadly prohibits offering
inducements to enter into insurance contracts --- cannot be said
to confer a private right of action. <u>See</u> <u>In re Hamm</u>, 498 B.R.
405, 408 & 409 n.1 (Bankr. W.D.N.Y. 2013) (concluding that
NYIL § 6504, an analogous section that prohibits mortgage
insurers from offering inducements, does not confer a private
right of action). The section prescribes statutory penalties
payable to the State for violations. <u>See</u> NYIL § 2324. The
section is designed to curb a general harm to the public, and
its enforcement by private plaintiffs would be inconsistent with
the legislative scheme.

Accordingly, the claims based on these sections of the NYIL
are **dismissed.**

### (ii)

The plaintiffs claim that they are entitled to rescissory
damages for any amounts charged and paid over-and-above the
premiums called for by the Approved GC Policies (in other words,

33

any payments due under the terms set forth in the RPAs) based on
violations of NYIL §§ 2314 and 2339.

NYIL § 2305 delineates between insurance policies that do
not require "prior approval of rates, rating plans, rating rules
and rate manuals by the superintendent," see NYIL § 2305(a), and
those types of insurance that do require prior approval, such as
"workers' compensation insurance," and "title insurance." See
NYIL § 2305(b). Pursuant to NYIL § 2305(b), an insurance carrier
must file rates with the Superintendent in order to obtain
approval. NYIL § 2314 provides that, "No authorized insurer
shall, and no licensed insurance agent, no title insurance
agent, no employee or other representative of an authorized
insurer, and no licensed insurance broker shall knowingly,
charge or demand a rate or receive a premium that departs from
the rates, rating plans, classifications, schedules, rules and
standards in effect on behalf of the insurer, or shall issue or
make any policy or contract involving a violation thereof." NYIL
§ 2339 provides that, "No member of or subscriber to a rate
service organization, and no insurer which makes and files its
own rates, shall charge or receive any rate which deviates from
the rates, rating plans, classifications, schedules, rules and
standards made and filed by such rate service organization."
While an insurer may apply to the Superintendent for permission
to deviate from a filed rate under NYIL § 2339(b), the

Superintendent must approve any such deviation. Neither NYIL §§ 2314 nor 2339 contains section-specific penalties.

The history and structure of NYIL §§ 2314 and 2339 show that the legislature intended that private enforcement would "augment" any administrative remedies for these sections. Maimonides Med. Ctr., 981 N.Y.S.2d at 746 (citation omitted). Indeed, courts considering NYIL §§ 2314 and 2339 --- and their predecessor sections, Insurance Law Sections 141 and 185 --- have permitted private parties to recover premiums charged and paid that deviated from the rates filed with the Superintendent based on a theory of rescission or unjust enrichment.

In Stephen Peabody, Jr., & Co. v. Travelers' Ins. Co., 148 N.E. 661, 662 (N.Y. 1925), the New York Court of Appeals addressed the state of the law before the enactment of Insurance Law Section 141. At the time the dispute arose, the NYIL required rates for workers' compensation insurance to be filed with the Superintendent of Insurance, but did not prohibit insurers from contracting around those rates. Id. at 662-63. The Court of Appeals nonetheless reasoned that, "A contract to disregard an increase in such rates or basis rate, and to ignore the disapproval of the rating association, and therefore of the superintendent of insurance was against public policy and void." Id. at 663.

Subsequent to the dispute at issue in <u>Stephen Peabody, Jr.</u>, the legislature codified the prohibition against deviation from filed rates. In its first 1922 incarnation, the Section in relevant part provided that, "No insurance agent, broker, corporation or association, shall charge a rate or receive a premium which deviates from the rate fixed or filed for and the rules applicable to such risk . . . ." 1922 N.Y. Laws ch. 660 § 141. Insurance Law Section 141 also provided for monetary penalties for its violation.

Under this section, courts entertained disputes between insureds and insurers involving alleged overcharges and undercharges pursuant to Insurance Law Section 141. <u>See, e.g.</u>, <u>Metro. Cas. Ins. Co. of N.Y. v. Rochester Fruit & Vegetable Co.</u>, 249 N.Y.S. 572, 577 (App. Div. 1931); <u>Employer's Liab. Assurance Corp., Ltd., of London v. Success-Uncle Sam Cone Co.</u>, 208 N.Y.S. 510, 512-13 (City Ct. 1925).

As part of later amendments to the NYIL, the Superintendent of Insurance gained substantial new enforcement powers, including the ability to return any overcharges to an insured after notice and a hearing. <u>See</u> 1939 N.Y. Laws ch. 618 § 187. Despite the expansion of administrative enforcement power, courts continued to view the prohibition against deviations from filed rates as a matter to be addressed by courts. <u>See, e.g.</u>, <u>Am. Motorists Ins. Co. v. N.Y. Seven-Up Bottling Co.</u>, 238

N.Y.S.2d 80, 82 (App. Div. 1963), aff'd, 196 N.E.2d 735 (N.Y. 1964); Pub. Serv. Mut. Ins. Co. v. Rosebon Realty Corp., 241 N.Y.S.2d 555, 557 (Civ. Ct. 1963); Am. Mut. Liab. Ins. Co. v. Davis, 36 N.Y.S.2d 211, 212 (City Ct. 1942).

Following intervening legislative changes, Section 141 eventually became NYIL §§ 2314 and 2339. New York courts --- including, recently, the Supreme Court of the State of New York, Appellate Division, Second Department --- have continued to entertain private suits to recover premium overcharges in disputes over rates that required prior approval. See Good v. Am. Pioneer Title Ins. Co., 783 N.Y.S.2d 841, 842 (App. Div. 2004) ("[T]he complaint alleged, in relevant part, that the defendant charged a title insurance premium in excess of the applicable rate published by the Title Insurance Rate Service Association in its Rate Manual. The proper interpretation of the Rate Manual, and the defendant's alleged violation thereof, presented questions of law cognizable by the court." (emphasis added)); Partell v. Fid. Nat'l Title Ins. Servs., No. 12-CV-376S, 2012 WL 5288754, at *1, *5, *7 (W.D.N.Y. Oct. 24, 2012) (denying a motion to dismiss claims for "money 'had and received' and unjust enrichment" to recover overcharges, and noting that "this case is not so 'nuanced' that a specialized tribunal is necessary"); Transp. Ins. Co. v. Star Indus., Inc., No. CV 01-1341 (ARL), 2005 WL 1801671, at *7 & n.6 (E.D.N.Y.

July 28, 2005) ("While there are few reported cases interpreting these sections, courts have recognized under the predecessor statute to Section 2314, that 'insurers are forbidden to charge or receive rates which deviate from those filed with the Superintendent.'" (citation and internal quotation marks omitted)).[8]

The plaintiffs, as employers purchasing workers' compensation insurance, are plainly members of a class designed

---

[8] Lang v. First Am. Title Ins. Co. of N.Y., 816 F. Supp. 2d 214 (W.D.N.Y. 2011), a decision by Chief Judge Skretney that predated his decision in Partell, does not aid the defendants. Lang dismissed federal claims pursuant to the Real Estate Settlement Procedures Act ("RESPA"), and declined to exercise supplemental jurisdiction over remaining state law claims; it did not, as the defendants suggest, hold that there was no private right of action under NYIL §§ 2314 and 2339. See id. at 220-21. Rather, in dismissing the RESPA claims, Lang noted that not all sections of the NYIL that "regulat[e] insurance rates" confer a private right of action. See id. at 219 (citing NYIL § 2320 (providing procedures for the examination of "rating and underwriting practices")). Lang was referring to NYIL sections that govern the propriety and reasonableness of filed rates. Indeed, in a follow-on action, Chief Judge Skretney dismissed a motion to compel arbitration, noting that the plaintiffs did not need to establish the existence of a contract to state claims for money had and received, and for unjust enrichment, to recover premiums paid for title insurance because the "Defendant's obligation to refrain from charging fees in excess of the filed rates stems from" NYIL § 2314. Lang v. First Am. Title Ins. Co., No. 12-CV-266S, 2012 WL 5221605, at *1, *5 (W.D.N.Y. Oct. 22, 2012); see also Partell, 2012 WL 5288754, at *5. The distinction is that the determination of the reasonableness of a filed rate is a question for the regulator, see Rothstein v. Balboa Ins. Co., 794 F.3d 256, 261 (2d Cir. 2015), while the determination whether the filed rate has been correctly applied is a question for a court. See Good, 783 N.Y.S.2d at 842 (citing United States v. W. Pac. R. Co., 352 U.S. 59, 66 (1956); Kovarsky v. Brooklyn Union Gas Co., 18 N.E.2d 287, 289 (N.Y. 1938)).

to benefit from these sections of the NYIL. As the court explained in Employer's Liab. Assurance Corp., Ltd., of London, 208 N.Y.S. at 512, Insurance Law Section 141 was enacted specifically with workers' compensation in mind, and for the benefit of employers because, among other reasons, employers must provide workers' compensation insurance to their employees. As the court recognized, ensuring compliance with filed rates was essential to the proper functioning of New York's workers' compensation insurance system because it ensured that employers, who have no option but to provide workers' compensation insurance, would be able to do so at reasonable rates. Id. at 512-13.

Moreover, the implied right of action undoubtedly promotes the legislative purpose of the NYIL to ensure that parties adhere to filed rates.

The implied right of action is also fully consonant with the legislative scheme. Like the Prompt Pay Law, NYIL §§ 2314 and 2339 both contain mandatory language: insurers "shall" not charge or receive a premium that deviates from a filed rate, and "shall" not issue any insurance contract that contravenes the filed rate. See also Maimonides Med. Ctr., 981 N.Y.S.2d at 743. Unlike issues that involve discretionary determinations, the determination of whether a premium-collected deviates from the filed rate does "not involve . . . intricate and technical

matters," Good, 783 N.Y.S.2d at 842, and "the determination of a violation and the calculation of resulting damages do not require any special agency expertise." Maimonides Med. Ctr., 981 N.Y.S.2d at 748; see also Partell, 2012 WL 5288754, at *5 ("[T]he principle issue is uncomplicated: did [the defendant] charge the full rate when it should have charged the discounted rate?").

Again similar to the Prompt Pay Law, NYIL §§ 2314 and 2339 are not aimed at rectifying a general public harm, or inhibiting a general business practice. Instead, these sections impose affirmative duties on parties to insurance contracts to adhere to filed rates. Only parties in privity to the subset of insurance contracts that require rate filing, see NYIL 2305(b), may sue to vindicate their statutory rights under NYIL §§ 2314 and 2339.

Accordingly, the plaintiffs have an implied right of action to seek rescissory damages under NYIL §§ 2314 and 2339. The plaintiffs have pleaded plausibly that any payments due in their "integrated statements" --- which reflected charges for the RPAs and Approved GC Policies in a single line-item --- were all in consideration for workers' compensation insurance. Thus, the plaintiffs have plausibly alleged that they are entitled to seek rescissory damages to the extent that the payments charged and paid exceeded the rates filed with the Superintendent.

The motion to dismiss the claims for rescissory damages under NYIL §§ 2314 and 2339 is **denied**.[9]

### B.

### (i)

In Count III, the NCS plaintiffs have brought a claim for breach of contract against Continental Insurance and California Insurance, while the RDD plaintiffs have brought a claim for breach of contract against only Continental Insurance.

---

[9] The defendants argue that California Insurance should be dismissed as a party because Continental Insurance, and not California Insurance, is responsible for issuing insurance to New York employers under the Profit Sharing Plans. The argument disputes an issue of fact, and ignores the plaintiffs' well-pleaded allegation that the NCS plaintiffs purchased policies from California Insurance, and that the policies were solicited, issued, and delivered in New York. See SAC ¶ 104. The policies issued by California Insurance allegedly covered NCS operations in states other than New York. The plaintiffs do not contend that there is a basis to dismiss the claims against California Insurance for want of personal or subject matter jurisdiction. The defendants' contention is therefore without merit.

The defendants also argue that the allegations against ARS and ARSNY are insufficient under Rule 8 of the Federal Rules of Civil Procedure to give those parties notice of the claims against them, but the allegations are sufficient to satisfy the low threshold for notice pleading. ARS prepared the marketing materials for the Profit Sharing Plan. Indeed, the Vermont and Wisconsin administrative orders specifically prohibited ARS from marketing and selling similar profit sharing plans in those states. See SAC, Exs. I-J. ARSNY allegedly knew that it was collecting improper payments on behalf of the other defendants, and it is plausible that it was at least acting in an agency capacity. The plaintiffs' theory is that the defendants took advantage of their organizational structure to effect the scheme. The Second Amended Complaint, and its attachments, give all of the defendants sufficient notice of the claims asserted against them. See Mahoney v. Endo Health Sols., Inc., No. 15-CV-9841(DLC), 2016 WL 3951185, at *3 (S.D.N.Y. July 20, 2016).

"Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous the terms are to be taken and understood in their plain, ordinary and proper sense." In re Estates of Covert, 761 N.E.2d 571, 576–77 (N.Y. 2001) (quoting Hartol Prods. Corp. v. Prudential Ins. Co. of Am., 47 N.E.2d 687, 689 (N.Y. 1943)). "'[W]hen the language of a contract is ambiguous, its construction presents a question of fact,' which . . . precludes summary dismissal." Crowley v. VisionMaker, LLC, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) (quoting Jackson Heights Med. Grp., P.C., v. Complex Corp., 634 N.Y.S.2d 721, 722 (App. Div. 1995)). "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) (citations omitted).

The thrust of the plaintiffs' breach of contract claims is that Continental Insurance and California Insurance treated the RPAs as though they modified the Approved GC Policies in breach of the following provision in the Approved GC Policies:

> This policy includes at its effective date the
> Information Page and all endorsements and schedules
> listed there. It is a contract of insurance between
> you (the employer named in Item 1 of the Information
> Page) and us (the insurer named on the Information
> Page). The only agreements relating to this insurance
> are stated in this policy. The terms of this policy
> may not be changed or waived except by endorsement
> issued by us to be part of this policy. SAC ¶ 47.

Although the plaintiffs argue that any modification of an

Approved GC Policy would be sufficient to state a claim for

breach of contract, the plaintiffs claim that the RPAs --- which

allegedly are not endorsements --- modified the Approved GC

Policies in material ways, including their effective periods,

premium rates, and cancellation fees. The plaintiffs claim that,

to the extent that Continental Insurance and California

Insurance relied on the provisions of the RPAs to alter the

terms of the Approved GC Policies, Continental Insurance and

California Insurance breached the terms of the Approved GC

Policies without the agreement of the plaintiffs.

The plaintiffs also argue that the RPAs violated other

related terms of the Approved GC Policies. For example, the

Approved GC Policies provided that, "All premiums for this

policy will be determined by our manuals of rules, rates, rating

plans and classifications." SAC, Ex. B at "Part Five – Premium,

Section A"; see also SAC ¶ 13. The plaintiffs claim that

Continental Insurance and California Insurance breached this

provision to the extent that the fees paid on the RPAs were in

consideration for workers' compensation insurance, and over-and-above the amounts called for by the rates to be determined by the filed manuals of rules, rates, ratings and classifications. See Employers Mut. Liab. Ins. Co. of Wis. v. Bromley, 158 N.Y.S.2d 669, 670 (Sup. Ct. 1957) (holding that a similar contractual provision incorporated the filed manual into the workers' compensation policy).

The defendants do not contend that the complained-of provisions have unambiguous interpretations that could foreclose the breach of contract claims. Instead, the defendants' primary response is that the RPAs were executed with AUCRA --- not Continental Insurance or California Insurance --- and that, because AUCRA was not a party to the Approved GC Policies, any agreement with AUCRA could not have modified the terms of the Approved GC Policies. Similarly, the defendants selectively point to a number of provisions in the RPA and statements in the marketing materials for the Profit Sharing Plan that disclaimed that the RPAs and Approved GC Policies were related. See, e.g., SAC, Ex. C at 7 ("Fees for services charged by any affiliate of [AUCRA] are not considered premium under the [Approved GC] Policies."). The defendants contend that these statements are conclusive proof that the contracts bore no relationship to each other. The defendants argue that the plaintiffs are in effect trying to combine unrelated contracts in an effort to

manufacture breach of contract claims. The defendants also argue
that, to the extent that the RPAs modified the terms of the
Approved GC Policies, the plaintiffs agreed to the
modifications, which read the allegedly breached provisions out
of the Approved GC Policies.[10]

Under New York law, "Whether the parties intended to treat
both agreements as mutually dependent contracts, the breach of
one undoing the obligations under the other, is a question of
fact. In determining whether contracts are separable or entire,
the primary standard is the intent manifested, viewed in the
surrounding circumstances." Rudman v. Cowles Commc'ns, Inc., 280
N.E.2d 867, 873 (N.Y. 1972). The Court of Appeals for the Second
Circuit identified in Arciniaga v. Gen. Motors Corp., 460 F.3d
231, 237 (2d Cir. 2006), four factors relevant for assessing
whether contracts should be read together: First, whether the
parties to the different contracts are the same; second, whether
the contracts are mutually dependent; third, whether the

---

[10] None of the parties have addressed the significance of NYIL
§ 3204(a)(1), which provides that, "Every policy of life,
accident or health insurance, or contract of annuity, delivered
or issued for delivery in this state, shall contain the entire
contract between the parties, and nothing shall be incorporated
therein by reference to any writing, unless a copy thereof is
endorsed upon or attached to the policy or contract when
issued." The section also provides that, "Any waiver of the
provisions of this section shall be void." NYIL § 3204(f); see
also Comm'rs of State Ins. Fund v. Wiz Constr. Co., 734 N.Y.S.2d
769, 770 (App. Div. 2001) (noting that NYIL § 3204 applies to
workers' compensation policies).

agreements refer to each other; and, fourth, whether the
agreements serve separate purposes.

Whether the parties intended the RPAs and the Approved GC
Policies to be treated as one contract raises issues of fact
that cannot be resolved at the pleading stage. See Nat'l Union
Fire Ins. Co. of Pittsburgh, Pa. v. Turtur, 892 F.2d 199, 205
(2d Cir. 1989) ("The issue of the dependency of separate
contracts, therefore, boils down to the intent of the parties.
Questions of intent, we note, are usually inappropriate for
disposition on summary judgment."). The plaintiffs have
plausibly alleged that their compliance with the Approved GC
Policies issued by California Insurance and Continental
Insurance was conditioned on their compliance with the terms in
the RPAs.

Although AUCRA is, at least formally, a different legal
entity from California Insurance, and Continental Insurance, the
Second Amended Complaint includes plausible allegations that the
distinction between the entities was superficial and should be
disregarded. In any event, contrary to the defendants'
assertions, the formal distinction between the parties is not
dispositive. See Turtur, 892 F.2d at 205.

It is plausible that the two contracts were mutually
dependent. The defendants marketed the Approved GC Policies
coextensively with the Profit Sharing Plans; in fact, the

plaintiffs could not gain coverage under the Approved GC
Policies unless they agreed to be prospectively bound by the
RPAs, sight-unseen. See SAC, Ex. E at 1 (conditioning coverage
under an Approved GC Policy on agreement to the RPA).

The plaintiffs received "integrated" bills that did not
differentiate between payments owed on the Approved GC Policies,
and payments owed on the RPAs; instead, payments owed on both
were reflected in a single line-item. The reasonable inference
is that the bills were structured so that the plaintiffs could
not choose to allocate their payments to satisfy only the
premiums due under the Approved GC Policies without breaching
the terms in the RPAs (or vice versa). Indeed, the plaintiffs
allege that Continental Insurance canceled the Approved GC
Policy issued to the RDD plaintiffs for "an alleged failure to
pay premiums due" even though the RDD plaintiffs had paid the
full amount of the premiums due under the Approved GC Policy.
SAC ¶ 122. It is a reasonable inference that the cancelation was
due to the RDD plaintiffs' breach of the terms found in the RPA.

The RPAs clearly reference the Approved GC Policies, and it
is apparent that the RPAs would serve no purpose without the
Approved GC Policies. Notwithstanding certain statements in the
RPAs that imply that they should be treated as separate from the
Approved GC Policies, it is plausible that the two can be
treated as one undertaking. See Carvel Corp. v. Diversified

Mgmt. Grp., Inc., 930 F.2d 228, 233 & n.2 (2d Cir. 1991). The marketing materials specified that the RPA was issued "in conjunction with a fully insured, guaranteed cost, workers' compensation policy." See SAC, Ex. F at 2.

The RPAs, together with the Approved GC Policies, plausibly serve the common purpose of providing workers' compensation insurance at rates that are affected by loss experience. The RPAs, and the materials describing them, are couched in the language of workers' compensation insurance. The Program Summary & Scenario explains that the costs associated with the Profit Sharing Plan are dependent upon the cost of, and "loss experience" associated with, claims filed against an Approved GC Policy during the life of the RPA. SAC, Ex. F at 1, 3. The cost of the "Profit Sharing Program" is compared to that of the "Guaranteed Cost Program" offered by the "Typical Competitor." SAC, Ex. F at 3. The Program Summary & Scenario states that the "actual [cost of the Profit Sharing Program] will vary depending upon [the insured's] future payroll and claims." SAC, Ex. F at 3. The RPA provides that its purpose is to enable an insured that has coverage under an Approved GC Policy to "share in the underwriting results of the *Workers' Compensation* policies of Insurance Issued for the benefit of the Insured." SAC, Ex. C at 1 (emphasis added). The patent for the defendants' scheme explains that, "The insured can now, in effect, have a

retrospective rating plan because of the arrangement among the insurance carrier, the reinsurance company and the insured even though, in fact, the insured has a Guaranteed Cost Insurance Coverage with the insurance Carrier." SAC, Ex. A at 7.

The defendants also contend that the RPAs are reinsurance contracts that by their nature cannot be construed together with the Approved GC Policies. The New York Court of Appeals has defined a contract of reinsurance as "a contract between two insurance companies in which the reinsured company agrees to cede part of its risk to the reinsurer in return for a percentage of the premium." Unigard Sec. Ins. Co. v. N. River Ins. Co., 594 N.E.2d 571, 574 (N.Y. 1992). According to the Court of Appeals, "A reinsurance contract operates solely between the reinsurer and the ceding company. It confers no rights on the insured." Id. The fact that the RPAs were executed with the insureds casts doubt on the "reinsurance" characterization.

At the very least, the allegations plausibly show that the RPA was an "agreement[] relating to this insurance" that was not "stated in the [Approved GC Policy]," see SAC ¶ 47, which is sufficient to state a claim for breach of contract at the pleading stage.

The defendants also argue that the plaintiffs consented to any changes to the Approved GC Policies, but there are issues of

fact as to whether the plaintiffs consented to the alleged modifications. The plaintiffs allege that they entered into the Approved GC Policies before they were provided with the terms of the RPAs, even though they were required to agree to the RPAs. Moreover, the plaintiffs allege that the terms of the RPAs were not adequately laid out in any marketing materials or other descriptive materials, and that they received allegedly excessive bills that were inconsistent with the terms of the Approved GC Policies that they had signed. These issues cannot be decided on a motion to dismiss.

Finally, the defendants argue that the breach of contract claims should be dismissed because the plaintiffs will not be able to prove any damages, but the "argument is premature." Xpedior Creditor Tr. v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 271 (S.D.N.Y. 2004). Whether the plaintiffs can establish damages raises questions of fact that again cannot be resolved at the pleading stage.

Accordingly, the motion to dismiss the breach of contract claims in Count III is **denied.**

### (ii)

As a variant on the breach of contract claim (Count III) against Continental Insurance and California Insurance, the plaintiffs argue that the transaction at issue must be interpreted in light of NYIL § 3103, which the plaintiffs claim

would rewrite the allegedly collapsed Approved GC Policies and RPAs such that only the terms of the Approved GC Policies survive. See SAC ¶ 179.

As explained above, under its plain terms, NYIL § 3103 reforms insurance contracts to be consistent with the provisions of the NYIL "[e]xcept as otherwise specifically provided." See Gonzales, 2016 WL 5107033, at *7; State v. Fed. Ins. Co., 594 N.Y.S.2d 445, 447 (App. Div. 1993) ("Defendant's failure to include the mandated provisions merely triggers Insurance Law § 3103(a) and the inclusion of the required provisions is made by implication."); Dana Woolfson LMT v. Gov't Emps. Ins. Co., 862 N.Y.S.2d 794, 795 (Civ. Ct. 2008) ("Even if the insurance policy lacked the mandatory Endorsement, then the applicable provisions of the Insurance Law or the applicable regulation, which 'has the force of law', are deemed to be part of the policy as though written into it." (quoting Raffellini v. State Farm Mut. Auto. Ins. Co., 878 N.E.2d 583, 586 (N.Y. 2007)).[11]

---

[11] The defendants argue that NYIL § 3103 can have no applicability to this case because a rescission remedy is inconsistent with NYIL § 3103. Although NYIL § 3103 may foreclose the rescission of an entire insurance contract, the section still operates to reform insurance contracts to the extent that they are inconsistent with the NYIL. See, e.g., EverHome Mortg. Co. v. Charter Oak Fire Ins. Co., No. 07-CV-98 (RRM), 2012 WL 868961, at *7 (E.D.N.Y. Mar. 14, 2012); In re Rapid-Am. Corp., No. 13-10687 (SMB), 2016 WL 3292355, at *12 (Bankr. S.D.N.Y. June 7, 2016).

The plaintiffs have thus far failed to identify any provisions of the NYIL or the WCL that would operate to reform the combination of the Approved GC Policies and RPAs. The sections of the NYIL cited by the plaintiffs (all of which have been discussed above) address actions that the DFS and insurers must (or must not) take; they do not address mandatory (or forbidden) terms that must (or cannot) appear in workers' compensation contracts.

NYIL § 2314, which prohibits the making of contracts that contravene the filed rates, is the only section cited that could possibly reform the combined RPAs and Approved GC Policies by replacing any terms related to rates that are inconsistent with the filed rates. But the plaintiffs already have an independent cause of action under NYIL § 2314 that constitutes a sufficient remedy; it is difficult to see what benefit the plaintiffs would derive by using NYIL § 3103 as a vehicle to reform the contract in this way.

Nevertheless, dismissal of the plaintiffs' claim based on NYIL § 3103 would be premature. Questions of fact exist regarding the relationship between the Approved GC Policies, and the RPAs, and thus the applicability of NYIL § 3103 to this case.

Accordingly, the defendants' motion is **denied** to the extent that the breach of contract claims (Count III) are based on

interpreting the Approved GC Policies through the lens of NYIL § 3103.

## c.

In Count IV, the plaintiffs have brought claims against the defendants for violations of N.Y. Gen. Bus. L. § 349.

### (i)

The defendants have moved to dismiss as time-barred the § 349 claim by the RDD plaintiffs. "[B]ecause the defendant[] bear[s] the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." Fargas v. Cincinnati Mach., LLC, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013) (citations omitted).

Section 349 is subject to a three-year statute of limitations. Corsello v. Verizon N.Y., Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). The New York Court of Appeals has clarified that the date of accrual "runs from the time when the plaintiff was injured," but the date of injury can vary depending on the circumstances. Id. In a case involving alleged omissions or misrepresentations, the injury occurs when the omission or misrepresentation was made. Id.; see also Graham v. Select Portfolio Servicing, Inc., 156 F. Supp. 3d 491, 513 (S.D.N.Y. 2016). In a case where statements or omissions created

53

"unrealistic expectations," the injury occurs when those
unrealistic expectations "were actually not met." Corsello, 967
N.E.2d at 1185 (citing Gaidon v. Guardian Life Ins. Co. of Am.,
750 N.E.2d 1078, 1083 (N.Y. 2001)); see also NYAHSA Servs., Inc.
Self Ins. Tr. v. People Care Inc., 5 N.Y.S.3d 329, 2014 WL
6889704, at *10 (Sup. Ct. 2014).

For the RDD plaintiffs' § 349 claim to be timely, the
injury to the RDD plaintiffs must have occurred within three
years of August 8, 2015, the date on which the NCS plaintiffs
commenced their class action suit. See Am. Pipe & Constr. Co. v.
Utah, 414 U.S. 538, 554 (1974) ("[T]he commencement of a class
action suspends the applicable statute of limitations as to all
asserted members of the class who would have been parties had
the suit been permitted to continue as a class action."); 
Choquette v. City of New York, 839 F. Supp. 2d 692, 697 n.3
(S.D.N.Y. 2012) ("[T]he Court of Appeals for the Second Circuit
has held that American Pipe tolling is part of New York common
law." (citing Cullen v. Margiotta, 811 F.2d 698, 719-21 (2d Cir.
1987), overruled on other grounds by Agency Holding Corp. v.
Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987))).

It is unnecessary to reach which accrual date applies in
this case because the RDD plaintiffs' § 349 claim is time-barred
in any event. At the latest, the transaction at issue failed to
meet the RDD plaintiffs' "unrealistic expectations" in July

2012, when the RDD plaintiffs purchased a new workers'
compensation insurance policy from another insurance carrier
after receiving escalating (and allegedly improper) demands for
additional premiums from Continental Insurance, and when
Continental Insurance canceled the Approved GC Policy. See SAC ¶
122.

The RDD plaintiffs argue that December 27, 2013 --- when
they received a demand letter for additional fees and costs ---
should mark the date of accrual, but it is plain that their
expectations with regard to the transaction had already gone
unfulfilled by that date. There is no allegation that the demand
letter constitutes a separate violation of § 349 in-of-itself
that would be subject to its own statute of limitation. Cf.
Gristede's Foods, Inc. v. Unkechauge Nation, 532 F. Supp. 2d
439, 453 (E.D.N.Y. 2007). The RDD plaintiffs' injury accrued, at
the latest, in July 2012 and their claim is thus time-barred.

The RDD plaintiffs also argue that the "continuing wrong"
doctrine should save their claims. To the extent applicable,
that doctrine leaves the RDD plaintiffs in the same position
because it could only delay the injury accrual date until July
2012, when the RDD plaintiffs stopped being charged premiums on
a regular basis. See Lucker v. Bayside Cemetery, 979 N.Y.S.2d 8,
18 (App. Div. 2013) ("The continuing violation theory is
inapplicable, since it pertains to a situation where the

injurious condition is intermittent, giving rise to recurring injuries."); see also Pike v. N.Y. Life Ins. Co., 901 N.Y.S.2d 76, 81 (App. Div. 2010).

Finally, the plaintiffs argue that the statute of limitations should be subject to equitable tolling. "Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) (internal quotation marks omitted). "Due diligence on the part of the plaintiff in bringing an action . . . is an essential element of equitable relief" and the plaintiff "bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel claim have ceased to be operational." Id. (citation, internal quotation marks and alteration omitted); see also Cooksey v. Digital, No. 14-CV-7146 (JGK), 2016 WL 5108199, at *5 (S.D.N.Y. Sept. 20, 2016).

"For equitable tolling to apply, plaintiff must show that the defendant wrongfully concealed its actions, such that plaintiff was unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner, or that defendant's actions induced plaintiff to refrain from

commencing a timely action." Martin Hilti Family Tr. v. Knoedler Gallery, LLC, 137 F. Supp. 3d 430, 467 (S.D.N.Y. 2015) (quoting De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 318 (S.D.N.Y. 2013)). "[I]n cases where the alleged concealment consisted of nothing but defendants' failure to disclose the wrongs they had committed, [the Court of Appeals has] held that the defendants were not estopped from pleading a statute of limitations defense." Corsello, 967 N.E.2d at 1184.

The arguments for equitable estoppel primarily relate to the December 2013 demand letter. While information disclosed in the demand letter may have provided the RDD plaintiffs with additional facts about their claims, and additional incentives to initiate this action, they certainly had enough information to bring their § 349 claim by July 2012. See Kainer v. Christie's Inc., 34 N.Y.S.3d 58, 60 (App. Div. 2016) (no equitable estoppel where the plaintiffs failed to establish that they required a document that they acquired after the time-bar had expired to bring their claim before its expiration). Although the RDD plaintiffs claim that the defendants rebuffed valid inquiries about the demand letter, the RDD plaintiffs fail to explain how that concealment, which occurred after the time-bar had expired, prevented the timely filing of this action. See Lucker, 979 N.Y.S.2d at 18.

Moreover, the allegations show that the RDD plaintiffs failed to act with due diligence. The RDD plaintiffs filed their complaint on March 6, 2016, more than two years after receiving the December 2013 demand letter from Applied Underwriters and almost four years after the cancellation of the Approved GC Policy. There is no basis for equitable tolling.

Accordingly, the motion to dismiss the RDD plaintiffs' § 349 claim as time-barred is **granted**.

### (ii)

The defendants have moved to dismiss for failure to state a claim the § 349 claim by the NCS plaintiffs. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service . . . ." N.Y. Gen. Bus. L. § 349(a). To plead a prima facie claim under § 349, the plaintiffs must allege that: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000); see also Tasini v. AOL, Inc., 851 F. Supp. 2d 734, 742 (S.D.N.Y.), aff'd, 505 F. App'x 45 (2d Cir. 2012) (summary order). The defendants argue that the NCS plaintiffs cannot establish the first two elements of the claim.[12]

---

[12] The defendants initially argued that the NCS plaintiffs had failed to allege an injury, but failed in their reply papers to

**(a)**

Although the text of § 349 does not explicitly limit the provision to conduct aimed at consumers, courts have consistently held that "the statute is, at its core, a consumer protection device." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995). Non-consumers, such as business competitors, may have standing to sue under § 349, but "the gravamen of the complaint must be consumer injury or harm to the public interest." Id. (citation omitted). The plaintiffs must show that "the acts or practices have a broader impact on consumers at large in that they are directed to consumers or that they potentially affect similarly situated consumers." Spirit Locker, Inc. v. EVO Direct, LLC, 696 F. Supp. 2d 296, 302 (E.D.N.Y. 2010) (citation and internal quotation marks omitted); see also Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 65 (2d Cir. 2010) ("[T]o demonstrate the requisite consumer-oriented conduct in a dispute concerning coverage under an insurance policy, a plaintiff must establish facts showing injury or potential injury to the public . . . ."); City of New York v. Smokes-

---

address any of the plaintiffs' arguments in opposition. The defendants' argument on this issue is accordingly deemed abandoned. See In re Dana Corp., 412 B.R. 53, 64 (S.D.N.Y. 2008). In any event, the argument is without merit. See, e.g., Jernow v. Wendy's Int'l, Inc., No. 07-cv-3971(LTS), 2007 WL 4116241, at *3 (S.D.N.Y. Nov. 15, 2007); Stoltz v. Fage Dairy Processing Indus., S.A., No. 14-CV-3826 (MKB), 2015 WL 5579872, at *22 (E.D.N.Y. Sept. 22, 2015).

Spirits.Com, Inc., 911 N.E.2d 834, 839 (N.Y. 2009) ("We . . . have emphasized that section 349 is directed at wrongs against the consuming public and that plaintiffs must demonstrate that the complained-of acts or practices have a broader impact on consumers at large." (citations and internal quotation marks omitted)). "Courts have stated consistently that unique private transactions between sophisticated business parties do not give rise to liability under [§ 349]." Spirit Locker, 696 F. Supp. 2d at 301; see also Tasini, 851 F. Supp. 2d at 742.

An insurance company's allegedly predatory conduct with respect to its insureds is "not inherently consumer-oriented." See Wilson, 625 F.3d at 65 (quoting Greenspan v. Allstate Ins. Co., 937 F. Supp. 288, 294 (S.D.N.Y. 1996)). In evaluating whether an insurer's conduct is consumer-oriented, courts consider a variety of factors, such as the premiums due on the policy, the nature of the policy, the relative sophistication and bargaining power of the parties, and whether the policy was standard or negotiated. N.Y. Univ. v. Cont'l Ins. Co., 662 N.E.2d 763, 770 (N.Y. 1995); see also Greenspan, 937 F. Supp. at 294.

The defendants argue that an employer's provision of workers' compensation insurance to its employees is inherently not "consumer-oriented" within the meaning of § 349. The recent decision of the Supreme Court of the State of New York,

Appellate Division, Third Department in <u>Accredited Aides Plus,</u>
<u>Inc. v. Program Risk Mgmt., Inc.</u>, No. 522231, 2017 WL 52812
(N.Y. App. Div. Jan. 5, 2017), held otherwise. That case
involved a variety of claims, including § 349 claims, against
the third-party party program administrator and claims
administrator (as well as their employees) of a group self-
insured trust (collectively, the "Administrator-defendants")
formed pursuant to WCL § 50(3) "to provide mandated workers'
compensation coverage to employees of trust members." <u>Id.</u> at *1.
The plaintiff-employers' claims were predicated on the theory
that "the [Administrator-defendants] unlawfully disseminated
materially misleading information about the trust to employers
seeking workers' compensation coverage, and that plaintiffs
relied upon this information in joining the trust." <u>Id.</u> at *6.

The court reinstated the plaintiff-employers' § 349 claims,
finding that the conduct alleged was consumer-oriented because
the "plaintiffs adequately met the threshold requirement of
alleging that the [Administrator-defendants'] 'actions and
practices were directed at or had a broader impact on consumers
at large.'" <u>Id.</u> (citations omitted). In particular, the court
noted that the plaintiff-employers had alleged that:

> [T]he [Administrator-defendants] "made materially
> misleading statements" through advertisements,
> marketing materials and its website that were
> "released to the general public," "target[ed]
> employers seeking workers' compensation coverage" and

"[were] likely to mislead reasonable employers." Plaintiffs further alleged that this deceptive behavior harmed plaintiffs and other trust members and that "their actions have jeopardized the workers' compensation benefits of New York employers and their employees." Id.

Accredited Aides Plus is on point. The allegations of consumer-oriented conduct are similarly compelling in this case. This is not a unique commercial dispute between two parties. The NCS plaintiffs allege that the Profit Sharing Plans were aggressively marketed nationwide to the "public at large," SAC ¶ 187, on standard forms on a take-it-or-leave-it basis. See Binder v. Nat'l Life of Vt., No. 02 CIV. 6411 (GEL), 2003 WL 21180417, at *6 (S.D.N.Y. May 20, 2003) (standard form insurance contracts weighed in favor of finding consumer-oriented conduct); M.V.B. Collision, Inc. v. Allstate Ins. Co., No. 07-CV-0187(JFB), 2007 WL 2288046, at *4 (E.D.N.Y. Aug. 8, 2007) ("Where, as here, a defendant enters into 'contractual relationship[s] with customers nationwide' via a standard form contract and has allegedly committed the challenged actions in its dealings with multiple insureds, courts have held that such behavior affects the public generally and therefore satisfies the requirement of 'consumer-oriented' conduct within the meaning of Section 349." (quoting Dekel v. Unum Provident Corp., No. 04-CV-00413(DLI), 2007 WL 812986, at *2 (E.D.N.Y. Mar. 14, 2007)).

62

The defendants allegedly targeted small-to-medium size insureds, which lacked the sophistication to evaluate the terms of the transaction and were especially vulnerable to being misled. Due to the modest size of the companies, and because the transactions involved workers' compensation insurance, the cost of claims for on-the-job injuries was allegedly modest, and the premiums owed should have been similarly modest (with the premiums only ballooning due to the defendants' allegedly deceptive conduct). As in Accredited Aides Plus, 2017 WL 52812, at *6, the NCS plaintiffs have plausibly alleged that they, and other similar employers (such as the RDD plaintiffs), may have gaps in workers' compensation coverage due to the defendants' deceptive practices, which have "also injured the general public," and "jeopardized the workers' compensation benefits of New York employers and their employees." SAC ¶ 191; see also Mahoney v. Endo Health Sols., Inc., No. 15-CV-9841(DLC), 2016 WL 3951185, at *9 (S.D.N.Y. July 20, 2016); Greenspan, 937 F. Supp. at 294; Allstate Ins. Co. v. Lyons, 843 F. Supp. 2d 358, 376 (E.D.N.Y. 2012).

Accredited Aides Plus vitiates the defendants' remaining arguments that the alleged conduct is not consumer-oriented. The defendants primarily rely upon Benetech, Inc. v. Omni Fin. Grp., Inc., 984 N.Y.S.2d 186, 188-89 (App. Div. 2014), another decision of the Supreme Court of the State of New York,

Appellate Division, Third Department, that dismissed § 349 claims involving the promotion of administrative services for tax-deferred retirement plans to school districts. Benetech predated the Third Department's decision in Accredited Aides Plus, did not involve workers' compensation insurance, concerned practices that were more limited in scale, and thus is not on point.

NYAHSA Servs., Inc. Self Ins. Tr. v. People Care Inc., 5 N.Y.S.3d 329, 2014 WL 6889704 (Sup. Ct. 2014), only found that the provision of workers' compensation insurance was not consumer-oriented because the policy at issue was the product of "extensive, individualized oral communications" that resulted in "custom proposals," and thus involved a dispute unique to the parties. Id. at *10-11. Likewise, Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs., Inc., No. CV 11-4825 (SJF) (ETB), 2012 WL 5289606 (E.D.N.Y. Sept. 13, 2012), report and recommendation adopted, No. CV-11-4825 (SJF) (ETB), 2012 WL 5289587 (E.D.N.Y. Oct. 24, 2012), involved a large policy specifically tailored to the plaintiffs' "needs," and "no facts whatsoever to show that [the plaintiffs'] particular interaction with [the defendant] is one that is or could be repeated with private consumers." Id. at *5. The other cases cited by the defendants do not involve workers' compensation insurance, and are not persuasive.

Accordingly, the NCS plaintiffs have plausibly pled that the defendants' conduct was consumer-oriented.

### (b)

To state a claim under § 349, the NCS plaintiffs must allege conduct that is "misleading in a material way." Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007). An act or omission is materially misleading if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741, 745 (N.Y. 1995); see also Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (noting that the definition of materially misleading is objective). "A deceptive practice, however, need not reach the level of common-law fraud to be actionable under section 349." Stutman v. Chem. Bank, 731 N.E.2d 608, 612 (N.Y. 2000). Additionally, the plaintiffs need not show actual reliance for a claim brought under § 349. Id.

The defendants argue that the NCS plaintiffs have failed to plead deceptive conduct. The defendants are correct that the action cannot be maintained to the extent that it is predicated on violations of the sections of the NYIL concerning licensing requirements and other related matters that do not include deceptive representations. See Schlessinger v. Valspar Corp., 991 N.E.2d 190, 193-94 (N.Y. 2013) ("Section 349 does not grant

65

a private remedy for every improper or illegal business practice, but only for conduct that tends to deceive consumers.").

However, beyond the violations of the NYIL, the NCS plaintiffs have plausibly alleged that the transaction at issue was materially misleading to consumers in numerous respects. The defendants argue that the terms of the marketing materials and the RPAs obviated any risk that a reasonable consumer could be deceived, but issues of fact as to whether the marketing materials and the RPAs sufficiently or even truthfully described the transaction plainly preclude dismissal.[13] See Delgado v. Ocwen Loan Servicing, LLC, No. 13-CV-4427 (NGG), 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) ("[T]he mere presence

---

[13] The allegations of deceptive conduct here are far stronger than in Woodhams v. Allstate Fire & Cas. Co., 748 F. Supp. 2d 211, 222, 225-26 (S.D.N.Y. 2010), aff'd, 453 F. App'x 108 (2d Cir. 2012) (summary order), where it was plain that all of the documents provided to the plaintiffs accurately described the insurance coverage to which the plaintiffs had agreed. See also Derbaremdiker v. Applebee's Int'l, Inc., No. 12-CV-01058 (KAM), 2012 WL 4482057, at *5 (E.D.N.Y. Sept. 26, 2012) ("[T]he statements on the receipt were not misleading or false, and . . . they did not contradict and were not inconsistent with the statements on the Website and in the Official Rules."), aff'd, 519 F. App'x 77 (2d Cir. 2013) (summary order). Similarly, the allegations of deceptive conduct were very different in Harvey Gerstman Assocs., Inc., 2012 WL 5289606: there, that the insurers had listed the wrong classification code in workers' compensation insurance agreements "even though the workers' compensation insurance policy explicitly provided that any and all classifications could be changed at the conclusion of the policy period," id. at *6; here, that consumers were being misled into agreeing to contracts that superseded the terms of Approved GC Policies with unfavorable terms.

66

of an accurate disclaimer does not necessarily cure other potentially misleading statements or representations on a product or advertisement.").

The NCS plaintiffs allege numerous instances of deceptive conduct. The NCS plaintiffs have plausibly alleged that they did not (and that the reasonable consumer would not) understand that their obligations under the Approved GC Policies were modified by their obligations under the RPAs based on a fair reading of the Approved GC Policies, the RPAs, or any other materials. The allegations of contradictory terms in the Approved GC Policies, and the other documents describing the Profit Sharing Plan, raise questions of fact as to whether the transaction was materially misleading. The NCS plaintiffs have plausibly pleaded that the marketing materials were materially misleading in that they did not adequately or even truthfully describe the RPAs, which the NCS plaintiffs did not receive until after agreeing to be bound by their terms. It is plausible that the status of the RPAs as "contracts of reinsurance" was misrepresented to consumers even though that information was material to a reasonable consumer. The Second Amended Complaint contains sufficient plausible allegations of deceptive conduct to support a claim under § 349. See Braynina v. TJX Cos., Inc., No. 15 CIV. 5897 (KPF), 2016 WL 5374134, at *6 (S.D.N.Y. Sept. 26, 2016); Gaidon v. Guardian Life Ins. Co. of Am., 725 N.E.2d 598, 604

(N.Y. 1999) (materially deceptive conduct plausibly pleaded where the "defendants lured [the plaintiffs] into purchasing policies by using illustrations that created unrealistic expectations").

The defendants also argue that the patent for their scheme adequately explained the mechanics of the transaction, which cured any misimpression. There is no allegation that the NCS plaintiffs were presented with the patent as part of the marketing materials. Whether a reasonable consumer of workers' compensation insurance would be expected to search for a relevant patent before purchasing a workers' compensation insurance policy clearly presents an issue of fact, as does the question of whether the patent adequately describes the scheme at issue.

Accordingly, the motion to dismiss the NCS plaintiffs' § 349 claim is **denied**.

D.

In Count V, the plaintiffs have brought claims for unjust enrichment against all of the defendants. The defendants maintain that the unjust enrichment claims should be dismissed because they are duplicative of the breach of contract claims.

Unjust enrichment claims are "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create

68

an equitable obligation running from the defendant to the
plaintiff." Corsello, 967 N.E.2d at 1185. "The existence of a
valid and enforceable written contract governing a particular
subject matter ordinarily precludes recovery in quasi contract
for events arising out of the same subject matter." Beth Israel
Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448
F.3d 573, 587 (2d Cir. 2006) (quoting Clark-Fitzpatrick, Inc. v.
Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987)).
"However, even though Plaintiffs may not ultimately recover
under both the breach of contract and unjust enrichment claims,
courts in this Circuit routinely allow plaintiffs to plead such
claims in the alternative." Transcience Corp. v. Big Time Toys,
LLC, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) (collecting cases).
A court may allow a breach of contract and an unjust enrichment
claim to proceed past the motion to dismiss stage when the
validity or scope of the contract is difficult to determine.
Hildene Capital Mgmt., LLC v. Friedman, Billings, RamseGrp.,
Inc., No. 11-cv-5832 (AJN), 2012 WL 3542196, at *11 (S.D.N.Y.
Aug. 15, 2012); see also U.S. Bank Nat'l Ass'n v. BFPRU I, LLC,
No. 16-CV-01450 (JGK), 2017 WL 398410, at *8 (S.D.N.Y. Jan. 30,
2017).

The unjust enrichment claims should not be dismissed at
this stage of the litigation. Three of the defendants --- ARS,
ARSNY, and Applied Underwriters --- are not parties to any

contract, and so the redundancy argument is inapplicable as to those parties. As for the remaining defendants that were parties to the contracts --- AUCRA, California Insurance, and Continental Insurance --- it is plain that there is a possibility that those defendants have "not breached a contract nor committed a recognized tort," but that "circumstances create an equitable obligation running from the defendant[s] to the plaintiff[s]." Corsello, 967 N.E.2d at 1185. The scope of the RPAs and Approved GC Policies, and their relationship, is clearly in dispute. "Because the scope of the contractual obligations and further factual developments regarding the conduct of the parties have yet to be determined, dismissing the plaintiffs' unjust enrichment claim at this stage would be premature." U.S. Bank Nat'l Ass'n, 2017 WL 398410, at *9.

Accordingly, the motion to dismiss the unjust enrichment claims is **denied.**

CONCLUSION

This Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss the Second Amended Complaint is **granted in part and denied in part.** The Clerk is directed to close all open motions.

**SO ORDERED.**

Dated:     New York, New York
           March 9, 2017

                                          John G. Koeltl
                              United States District Judge